In the Matter of the Application of JOSEPH K. BISTANY et al., Appellants, for the Adoption of ELLEN MATEJKA.

JOSEPH MATEJKA et al., Respondents.

Adoption — parent and child — reversal by Appellate Division of order of adoption on new finding of fact that there had been no abandonment of child by parents — conclusiveness thereof in Court of Appeals — order affirmed unless, giving to parents benefit of every controverted fact, finding of abandonment follows as inference of law.

Where in granting a petition for the adoption of a child the county judge held that the parents, who were living and refused to consent to the adoption, had abandoned the child so that their consent was unnecessary, but on appeal the Appellate Division made a new finding that there had been no abandonment and reversed the order of adoption on the law and the facts, in order to prevail upon an appeal to this court from such order of reversal, the petitioners must be able to show that even though the parents be given the benefit of every controverted fact, a finding of abandonment follows as an inference of law. Upon examination of the record, *held*, that the finding of the Appellate Division must stand since it cannot be said that the silence and inaction of the parents were prolonged to such a point that an intention to abandon the child must be inferred as matter of law.

*Matter of Bistany*, 209 App. Div. 286, affirmed.

(Argued June 2, 1924; decided October 7, 1924.)

APPEAL from an order of the Appellate Division of the Supreme Court in the fourth judicial department, entered May 7, 1924, which reversed an order of Erie County Court allowing and confirming the adoption of a child and vacated said order.

*Nathan L. Miller* for appellants. The neglect of the parents for three and a half years to perform the parental obligations of care and support constitutes an abandonment within the meaning of the statute as a matter of law. (L. 1909, ch. 197, § 111, subd. 3; *Matter of Lar-*

son, 31 Hun, 539; *Matter of Hayford,* 109 Misc. Rep. 479; *People ex rel. Lentino* v. *Feser,* 195 App. Div. 90; *Winans* v. *Luppie,* 47 N. J. Eq. 302; *Wood* v. *Wood,* 77 N. J. Eq. 593; *Parsons* v. *Parsons,* 101 Wis. 76.)

*Olin T. Nye* for respondents. The only question before the Court of Appeals on this appeal is whether the record contains evidence to support the finding of fact by the Appellate Division that the parents had not abandoned the child. (*Acme Realty Co.* v. *Schinasi,* 215 N. Y. 495; *Union Trust Co.* v. *Oliver,* 214 N. Y. 517; *Lamport* v. *Smedley,* 213 N. Y. 82.) The finding of fact made by the Appellate Division that the parents had not abandoned the child is supported by the evidence and should be affirmed. (*Matter of Johnston,* 76 Misc. Rep. 374; *People* v. *Joyce,* 112 App. Div. 717; 189 N. Y. 518; *Silberstein* v. *Silberstein,* 218 N. Y. 525; *People ex rel. Demos* v. *Demos,* 115 App. Div. 410; *Williams* v. *Williams,* 130 N. Y. 193; *Domb* v. *Domb,* 195 App. Div. 526; *Matter of Hayford,* 109 Misc. Rep. 479; *Matter of Larson,* 31 Hun, 539; *Matter of Miller,* 119 Misc. Rep. 638; *People ex rel. Lentino* v. *Feser,* 195 App. Div. 90.)

CARDOZO, J. In September, 1923, Joseph K. Bistany and Katherine, his wife, submitted to a judge a petition that Ellen Matejka, then about six years of age, be adopted as their child. The parents are alive, and have refused to consent to the adoption. The county judge held that they had abandoned the child, and that because of such abandonment their consent was unnecessary. Section 111 of the Domestic Relations Law (Consol. Laws, ch. 14, as amended by L. 1922, ch. 628), though providing for consent in general, establishes an exception in the case of " a parent who has abandoned the child, or is deprived of civil rights, or divorced because of his or her adultery or cruelty, or adjudged to be insane, or to be an habitual drunkard, or judicially deprived of the

1924.]              Opinion, per CARDOZO, J.        [239 N. Y. 19]

custody of the child on account of cruelty or neglect."
The Appellate Division, to which the parents appealed,
made a new finding that there had been no abandonment,
and reversed the order of adoption on the law and the
facts. From the order of reversal, the petitioners appeal
to this court. To prevail they must be able to show that
even though the parents be given the benefit of every
controverted fact, a finding of abandonment follows as
an inference of law.

Controversy, where there is any, being resolved in
favor of the parents, the following facts may be found
to be established: In June, 1920, Joseph and Susan
Matejka were living at 415 East Seventy-first street in
the city of New York. With them were four children,
two sons by a former marriage, and a son and a daughter
by this marriage. The daughter, Ellen, was then about
two and a half years old. Joseph Matejka, the father,
was employed as foreman in an automobile factory, and
at the time of the hearing was earning sixty-five dollars
a week. Susan Matejka, the mother, kept a small
grocery store in front of the apartment, which consisted
of a living and dining room, two bedrooms, a kitchen
and a bathroom. Mrs. Matejka had a sister, Mary
Feriancik, who was then serving as housekeeper in the
home of the Bistanys at Cheektowaga, near Buffalo.
This sister came to New York city in June, 1920, to visit
the Matejkas, and, upon leaving, took the child Ellen
with her. The child had been ill, and it was thought the
change would do her good. Nothing was said about a
permanent separation. On the contrary, the statement
was that she was to be away about two months, which,
it was then thought, would be sufficient to permit her
health to be restored. The aunt, Mary Feriancik, does
indeed, testify that she was told even then to give the
child to the Bistanys and have them keep it as their
own. This seems improbable since there is no pretense
that the new parents had been consulted about an enlarge-

[235 N. Y. 19]    Opinion, per CARDOZO, J.    [Oct.,

ment of their household. The triers of the facts have accepted the parents' version.

After Ellen's departure, Mrs. Matejka was ill for many weeks, suffering from rheumatism and other ailments. In November, 1920, she also went to Cheektowaga, where she stayed for some weeks as a guest under the petitioners' roof. She says that while she was there, she was asked by Mrs. Bistany to consent that Ellen be adopted, and in answer she refused. True, the testimony for the petitioners presents another picture. Again we must assume the acceptance of the parents' version. Mrs. Matejka, upon leaving, was about to take the child away with her, but was dissuaded by her sister. The sister urged that Ellen be left there for the present till the mother became stronger. Moved by these entreaties, Mrs. Matejka came back alone. She was still in poor health, and soon afterwards became with child. A baby was born to her in 1921, and another in the summer of 1923, a few months before the hearing. She wrote some letters to her sister, though infrequently, inquiring about Ellen, and was informed that all was well. Finally, she became restless, and wished the child to be returned. About Christmas, 1922, she wrote to her sister, and proposed to go again to Cheektowaga and take the child away. The sister answered that the Bistanys had other company, and that a visit would be inconvenient then, but that she would come to New York in the spring and bring the child with her. Again there is a denial by the sister, but again we must act on the assumption that the denial has been discredited. The spring came, but not the promised visit. Mrs. Matejka then sent another sister, Anna, to Cheektowaga with instructions to bring the child home. This was in May, 1923. Anna reported on her return that the Bistanys took the ground that they would keep Ellen for themselves. About the same time the parents employed a lawyer who wrote a letter of demand, but still without avail. The birth of the

1924.]　　　　Opinion, per CARDOZO, J.　　　[239 N. Y. 19]

youngest child made it impossible for the mother to go to Buffalo at once. She went there on September 7, 1923, and made demand in person that Ellen be returned. A few weeks later this proceeding was begun.

We are unable to yield to the petitioners' contention that the facts above recited point so decisively to an abandonment that every other inference must be held to be excluded.

The mother refused in the latter part of 1920 to consent to the adoption of her child. The refusal was warning to the petitioners that there was no intention to abandon, and that custody, if retained, was subject to the parental right. The significance of the events that followed was for the triers of the facts, to be viewed, however, in the light of the events that had gone before. The child was left where she was for more than two years longer without request that she be sent home. Conceivably this might mean that the parents had changed their mind, and were willing to give her up. At least as reasonably it might mean that their position had been declared, and that sufferance could no longer be misinterpreted as surrender.

We see little, if any, significance in the failure to send money. A different case would be here if there had been the slightest reason to believe that contributions of money were either needed or expected. The child was with kind friends under the same roof as her aunt. The parents knew full well that the childless couple who had taken the little one into their home were moved by interest and affection, and were not looking for pay. We can hardly doubt that money, if tendered, would have been scornfully returned. Unwise the parents may have been in the acceptance of favors so unusual. They did not forfeit their parenthood in becoming the recipients of bounty.

We have no thought to understate the case for the petitioners or the equities of their position. Undoubtedly,

the inference is permissible and even necessary that father and mother were willing for the time being to leave the child with generous folk of ample means who were anxious to have her with them and to care for her as their own.  More than that must be shown before this order may be disturbed.  After the finding by the Appellate Division adverse to the petitioners, the order under review must stand unless we are prepared to hold that by acts so unequivocal as to bear one interpretation and one only the parents manifested an intention to abandon the child forever.  They may have weakly hesitated.  They may have foolishly delayed.  They may have drifted into a situation in which their desires and expectations were open to misconception.  They may even have experimented a little, to test their own feelings.  All that is not enough.  They must be found to have renounced.  The petitioners would have us hold that what began, so to speak, as a loan, was thereafter transformed into a gift, and this though a readiness to give had been explicitly disclaimed.  We cannot say that silence and inaction were prolonged to such a point that an intention to surrender becomes an inference of law.

Stress has been laid in argument upon the welfare of the child, her prosperity and happiness.  We do not dwell upon such considerations, for they are foreign to the issue.  We digress merely to state that nothing in this record gives color to a suspicion that the parents are actuated by any sinister design.  If the proceeding were habeas corpus, to determine custody alone, there would be need to consider whether the welfare of the child might be held to be controlling.  The petitioners ask for more than custody.  They seek to make the child their own.

The order must be affirmed with costs.

McLAUGHLIN, J. (dissenting).  This proceeding was instituted for the adoption of Ellen Matejka, an infant

1924.]      Dissenting opinion, per McLAUGHLIN, J.     [239 N. Y. 19]

about six years of age, without the consent of her father and mother, upon the ground that she had been abandoned by them within the meaning of article 7, section 111, subdivision 3 of the Domestic Relations Law (Cons. Laws, ch. 14). The provision of the statute, so far as material, provides: " * * * but the consent of a parent who has abandoned the child, * * * is unnecessary * * *."

The county judge found that the father and mother had abandoned the child and made an order of adoption. The Appellate Division found that the father and mother had not abandoned the child, reversed the order, and dismissed the petition.

The sole question which the appeal brings before this court is whether the undisputed facts establish the abandonment as matter of law. All disputed facts have been resolved in favor of the respondents and are binding upon this court. What I consider the material facts, as bearing on the question of abandonment, are not in dispute.

Joseph and Susan Matejka were married on the 19th of June, 1913, and there was born to them, on the 23d of November, 1917, the child Ellen, whose adoption is here in question. Joseph Matejka, at the time of his marriage, had two sons by a former marriage, then about six and four years of age. Ellen is the eldest child of the present marriage. She has three younger brothers, who, at the time of the hearing, were four years, two years, and ten months of age.

In March, 1920, the father and mother lived (and still live) at 415 East Seventy-first street, New York city, in a tenement consisting of two bedrooms, a dining room, kitchen and bathroom, on the ground floor of a building with a grocery store in front, kept by the mother. The father was then, and since has been, earning from thirty to sixty-five dollars a week. The family then consisted of his wife and himself, the two

children by his former marriage, Ellen, and a little baby boy.

Joseph K. Bistany and Katherine Bistany, his wife, the petitioners, live a short distance from Buffalo, N. Y., in the town of Cheektowaga, where they have a residence and three acres of ground. He has a profitable business in the city of Buffalo, from which he draws $5,000 a year, the balance of the profits made being left in the business.

Mary Feriancik, a sister of Mrs. Matejka, aunt of the child Ellen, was, at the time of the trial and for some fifteen years prior thereto had been, a housekeeper in the Bistany household. Another sister, Anna, had also worked for Mrs. Bistany, as had Mrs. Matejka.

In March, 1920, the sister Mary visited Mrs. Matejka in New York, and the child Ellen was then about two and a half years of age. She was just recovering from an attack of measles, was emaciated and undernourished, and her parents decided to send her to the Bistanys with her aunt, where she has since remained and been cared for by them exactly as if she were their own child.

The fact is not disputed that the father of Ellen never saw her from the time she was taken by her Aunt Mary, in March, 1920, until he saw her at the hearing of the present proceeding; that he had never written to or communicated with the petitioners during that time with reference to Ellen; that he had never contributed one cent during such time for her support or maintenance; nor is the fact disputed that during that time the mother had seen Ellen but once, and that was in the latter part of 1920, when she visited the home of the petitioners for a period of something like three weeks. She never inquired or made any effort to ascertain the condition of Ellen or how she was being cared for or treated, except possible reference to her in at most three letters which passed between her and her sister Mary, until shortly

1924.]     Dissenting opinion, per McLaughlin, J.    [239 N. Y. 19]

before the institution of this proceeding. She never contributed anything to her maintenance and support, and Ellen, during all that time, was never shown any affection or regard by her, except she did send her a little box as a Christmas present in 1921 and a belt as a birthday present in 1922.

It is true there is a dispute between the Matejkas and the Aunt Mary as to just what was said when the child Ellen was taken by the latter to the petitioners' home, and also what was said when Mrs. Matejka visited the petitioners in the latter part of the year 1920. The aunt testified that both Mr. and Mrs. Matejka insisted that she should take Ellen to the petitioners to keep and Mr. Matejka told her to take her and give her to the petitioners. Mrs. Matejka said that the talk was that Mary was to take the child to Mrs. Bistany's house " for a few weeks or a few months, but no longer," and the father testified she was to take the child to Buffalo " for a couple of weeks, or a couple of months." The fact, however, is undisputed that on the occasion of Mrs. Matejka's visit to the petitioners' home in the latter part of 1920, there was talk of a legal adoption of Ellen by the petitioners. The Aunt Mary testified that on that occasion Mrs. Matejka promised when she returned to New York to send adoption papers, while Mrs. Bistany testified Mrs. Matejka said: " She would never take the baby under any circumstances " and that the father " would never take it; * * * that the baby was ours." Mrs. Bistany testified she had already made a will, giving her property to Ellen, but she wanted to have a legal adoption. Mrs. Matejka admits she told Mrs. Bistany that she would will the child to her, but she denied promising to send the consent to the adoption papers, or that she said " the baby was ours."

The fact is undenied that on the occasion of that visit Ellen did not know her mother and the mother did not tell her anything about her parentage.

The conflict in the evidence as to these conversations I pass over as unimportant, since action, not words, must necessarily determine whether or not the child was abandoned. This must be determined from the conduct of the parties. An abandonment, in some respects, is analogous to desertion of a wife by a husband, and in order to ascertain that fact, the court always looks, not to what the parties say, but to their conduct. (*Pulford* v. *Pulford*, Law Rep. 1923, Prob. Div. 18, 21.)

The learned Appellate Division, as appears from the opinion, considered Mrs. Matejka's conduct while visiting the petitioners near the close of the year 1920, " reprehensible " and " if she alone were concerned, it might be sufficient to warrant a holding of abandonment. But the father's rights are also involved." If her conduct were reprehensible and might be a justification for an abandonment, what can be said of the father's conduct? He never indicated the slightest interest in his daughter from the day she left his house until she was produced on the hearing herein. He knew she had been taken into a family, strangers to his blood, who were caring for and maintaining her, but in what way, he had no personal knowledge, and, so far as appears, never sought to obtain any, or indicated the slightest interest in her existence.

In view of the decision of the Appellate Division, this court must assume that the parents gave the aunt permission to take Ellen to the petitioners' home to keep for only a couple of weeks or a couple of months, and at the time of the mother's visit a few months later she refused to consent to the adoption of Ellen by the petitioners. But, notwithstanding such assumption, the undisputed facts establish, as it seems to me, abandonment under the statute as matter of law. This court has never defined, so far as I am able to discover, the correct meaning of the word " abandon " as used in the statute. The purpose of the statute in determining

the meaning of the word " abandon " must be considered. Its obvious purpose is to provide a way or means for the changing of parental rights and duties from natural to foster parents. The natural parents must consent to the adoption, unless they have abandoned the child, that is, have failed, neglected or refused to perform their parental duties toward the child. Here, they did not consent to the adoption. They did neglect, refuse and fail to perform the duties of natural parents. For three and a half years they wholly neglected to perform such duties, but permitted the child to be cared for and supported by the petitioners, upon whom neither the ties of relationship nor moral responsibilities imposed any duties whatever.

The term " abandon " means, it seems to me, neglect and refusal to perform the natural and legal obligations of care and support. If a parent withholds his presence, his care, the opportunity to display filial affection, and neglects to lend support and maintenance, such parent thereby relinquishes all parental claims and abandons the child. This meaning has been accorded to the word by some of the other courts of this State, and also in other jurisdictions under statutes quite similar to our own. (*Matter of Larson*, 31 Hun, 539; *People ex rel. Lentino* v. *Feser*, 195 App. Div. 90; *Winans* v. *Luppie*, 47 N. J. Eq. 302; *Wood* v. *Wood*, 77 id. 593; *Parsons* v. *Parsons*, 101 Wis. 76; *Children's Aid Soc.* v. *Davis*, 100 So. Rep., 325. See, also, *Allison* v. *Bryan*, 30 L. R. A. [N. S.] 150, note.)

In *Parsons* v. *Parsons* (*supra*) the court, speaking of abandonment, said: " The term ' abandonment ' obviously means no more than neglect or refusal to perform the natural and legal obligations of care and support which parents owe to their children."

*Winans* v. *Luppie* (*supra*) is in some respects quite like the instant case. There, the Orphans' Court made an order of adoption, against the objection of the natural

mother. On appeal the order was reversed on the ground that the mother had not abandoned the child, but on appeal therefrom to the Court of Errors and Appeals, such order was reversed and the order of the Orphans' Court affirmed, on the ground that the facts established an abandonment as matter of law within the meaning of the New Jersey statute, which provided that the consent of a parent who had abandoned the child was unnecessary. In that case the mother, who was poor, had permitted the child to be " nurtured, maintained and educated " both secularly and religiously, as a daughter of the foster parents in a station of life far above that of the natural mother. That course of conduct was held to constitute an abandonment within the statutory sense, the court emphasizing the fact that the mother had allowed the daughter to acquire " habits, tastes and affections " conformable to the circumstances in which she was permitted to live, and that to break up such relations would seriously interfere with and endanger her happiness.

So, in the case now before us, if it be true, as contended by the respondents, that the father and mother of Ellen only allowed the Aunt Mary to take the child to the home of the petitioners for a couple of months and no longer, nevertheless, at the end of that time they permitted her to remain in the household of people upon whom she had no natural claim and to acquire habits and tastes conformable to a station in life much above their own. And if it be true, as testified to by the mother, that on her visit to the petitioners, near the close of the year 1920, she refused to consent to the adoption, she then knew, if she did not before, that the child had lost all memory of her mother and father, that she was being treated in every way by the petitioners as their own daughter, and she did not even then let the child know she was her mother. If it also be true that she expected the child to be shortly returned to

her own home, she certainly gave no evidence of such expectation for nearly three years thereafter.

The undisguised fact is that both the parents of the child permitted her, for three and a half years, when she was of such tender years that she would retain no memory of her natural parents, or former home, to be taken into a family much above their own station in life, to be instructed and cared for by others as their own and to acquire a taste for material comforts and luxuries which they could not possibly give her.   Now, at the age of six and a half years, they wish to break up those pleasant relations by taking her into an east-side tenement, consisting of a dining room, kitchen, two bedrooms and bathroom, already overcrowded by the parents and five boys.   This, the court ought not to sanction.   It is not for the interest of the child and her interest must certainly be considered.   The statute clearly contemplates that.   It says, if the judge be " satisfied that the moral and temporal interests of the person to be adopted will be promoted thereby " he " *must* make an order allowing and confirming such adoption,   *   *   *." (Section 113.)

It seems to me there cannot be the slightest doubt in the mind of any one, upon the uncontradicted facts set out in this record, that " the moral and temporal interests " of this child will be promoted by the adoption.

The truth undoubtedly is that for some reason undisclosed the parents of the child have now changed their minds — whether on account of suggestions made by others or the existence of some sentiment, real or imaginary, we cannot say; but we can say, however, that they have neglected, for three and a half years, to perform their parental duties.   They have permitted the child, during that time, to become accustomed to a manner of life, to make attachments and associations of which she cannot, without material injury to her, be deprived, without seriously endangering her happiness and well-being.

In view of that fact, I think we should hold that the parents abandoned this child, and, therefore, the petitioners can adopt her without their consent.

I am of the opinion that the order of the Appellate Division should be reversed and the order of the county judge affirmed.

HISCOCK, Ch. J., ANDREWS and LEHMAN, JJ., concur with CARDOZO, J.; McLAUGHLIN, J., reads dissenting opinion, with whom CRANE, J., concurs; POUND, J., not voting.

Order affirmed.