## In the Matter of the Adoption of a Minor under the Age of Fourteen Years.

### ANONYMOUS.

Surrogate's Court, Westchester County. January 27, 1942.

*Smith, Ranscht & Mitchell,* for the petitioners.

*John J. Gibney,* for the respondent.

MILLARD, S.   Petitioners have made application for an order to approve the adoption of a baby girl of whom respondent, an adult person, is the natural mother. Respondent, having been duly cited, appeared by counsel and interposed an answer opposing the application.

On the hearing had herein it was conceded that the child was born out of wedlock in the State of New York on October 25, 1940. During her confinement the respondent mother was a patient at a hospital where she was attended by the ward doctor, having no personal physician. Prior to her discharge respondent testified that she informed the ward doctor that she wanted to have the baby placed in a private home, stating that due to the unfortunate circumstances surrounding the birth she had no place to take the baby. The matter was referred to the doctor in charge of the obstetrical division of the hospital who thereafter interviewed both respondent and her mother. The latter doctor testified that he explained to respondent the legal effect of an adoption, that she would relinquish forever her parental rights to the child and endeavored to dissuade her from giving it up. In spite of this advice, however, he further testified that respondent was determined to place the child as soon as possible so that she could leave the hospital. The doctor then arranged to have petitioners call at the hospital to examine the baby and, upon being informed of their willingness to take the child, arrangements were made with the present attorneys for petitioners, who had represented them in a prior adoption proceeding, to prepare a legal document for respondent to execute. The paper so prepared was delivered to the doctor at the hospital and was signed, acknowledged and verified by respondent on November 7, 1940, before a notary public, an employee of the hospital.

The paper so executed by respondent is commonly known and referred to as a surrender agreement wherein respondent agreed, among other things, to " voluntarily and unconditionally surrender the said child to the care and custody of [names omitted] and I hereby pledge myself not to interfere directly or indirectly with the custody or management of the said child in any way or encourage or allow anyone else to do so * * * and I do hereby expressly consent to the adoption of said child by the said [names omitted] without notice to me, any law to the contrary notwithstanding." There is a direct conflict of testimony as to the circumstances attending the execution of the paper. It is uncontroverted that there were five persons in the room, namely, the doctor, the nurse, the notary, respondent and her mother. The doctor testified that he read the paper in full, both respondent and her mother denying this; the notary had no recollection of whether the paper was read or not and the nurse was not called as a witness. Respondent admits signing the paper, but asserts she did not know its contents and its legal effect was not explained to her. It is conceded that at the time respondent executed the agreement the names of petitioners had not been typed in, that after the agreement was

executed and delivered to petitioners the venue in the caption thereof was changed from County Court to Surrogate's Court and further that respondent was not given a copy of the agreement. It is undisputed that almost immediately after the execution of the agreement, respondent left the hospital, the baby, however, remaining at the hospital until November 19, 1940, when she was delivered to petitioners with whom she has resided and been cared for continuously ever since.

Adoption was unknown at common law and consequently the relationship can be consummated only in the manner prescribed by statute. (*Matter of Thorne*, 155 N. Y. 140; *Matter of Cohen*, 155 Misc. 202.) Unless, therefore, petitioners have substantially complied with the pertinent statutory provisions they cannot prevail. (*Matter of Cohen, supra; Matter of Marks*, 159 Misc. 348, 350; *Matter of Bamber*, 147 id. 712; *Murphy* v. *Brooks*, 120 id. 704; *Matter of Monroe*, 132 id. 279; *Matter of Ziegler*, 82 id. 346; affd., 161 App. Div. 589.) The governing statutory provisions are found in sections 111 and 112 of the Domestic Relations Law, the pertinent provisions of which may be summarized as follows:

1. The consent of the mother of a child born out of wedlock is required (§ 111, ¶ 1, cl. 3), but such consent is not required of a parent " who has abandoned the child or who has surrendered the child to an authorized agency for the purpose of adoption under the provisions of the social welfare law or who has been deprived of civil rights or who has been divorced because of his or her adultery or who is insane or who has been judicially declared incompetent or who is a mental defective as defined by the mental hygiene law or who has been adjudged to be an habitual drunkard or who has been judicially deprived of the custody of the child on account of cruelty or neglect." (§ 111, ¶ 2.)

2. The necessary parties must appear personally before the surrogate and execute in his presence the required papers, including the consent of the parent. (§ 112, subd. 2.)

3. In the event the consent of the parent, whose consent is necessary to the adoption, is duly acknowledged or proved and certified in form sufficient to entitle a conveyance to be recorded in this State, the surrogate may grant the order of adoption without the personal appearance of such parent. (§ 112, subd. 5.)

4. Where the foster child is less than eighteen years of age no order of adoption shall be made until the child has resided with the foster parents for at least six months unless the surrogate, in his discretion, dispenses with such residence. (§ 112, subd. 7.)

In the instant case all of the essential statutory requirements have been substantially complied with except that the respondent

mother has refused and still refuses to sign and acknowledge before the surrogate a consent to the adoption. Petitioners contend, however, that the execution of such consent before the surrogate is unnecessary, *first,* upon the ground that respondent abandoned the child, and *second,* for the reason that the execution by her of the surrender agreement hereinabove described dispenses with the necessity of executing before the surrogate any further consent. These contentions will be disposed of in the order named.

It is well established and in fact undisputed, that petitioners have the burden of proof on the issue of abandonment. (*Matter of Marks, supra.*) The abandonment contemplated by the drafters of the legislation under consideration is held to be one existing at the time of the adoption. (*Matter of Davis,* 142 Misc. 681.) In his efforts to prove abandonment, within the meaning of the statute, counsel for petitioners places great reliance upon the effect of the aforementioned surrender agreement executed by respondent. In that connection, I find that said agreement in its uncompleted form was read in full to respondent at the time of its execution by her. However, whether that be true or not is immaterial in the absence of fraud, for respondent having conceded that she signed the paper is conclusively bound by the provisions thereof. (*Pimpinello* v. *Swift & Co.,* 253 N. Y. 159.) Respondent testified, however, and it is unrefuted, that within a short time thereafter she attempted to regain possession of the child; that such efforts to locate the whereabouts of the child commenced on or about November 22, 1940, and were almost continuous down to the time that she retained present counsel to represent her in or about the month of June, 1941. Among other things it is undisputed that on or about May 6, 1941, she called at the office of the attorneys for petitioners and demanded the return of the child. On this state of facts, the first question, therefore, presented is whether, as a matter of law, respondent could revoke the aforementioned agreement or whether such agreement constitutes in and of itself an irrevocable act of abandonment. This question was squarely presented in *Matter of Cohen* (*supra*), and under somewhat similar circumstances Surrogate WINGATE declined to approve the adoption. There, as in the case at bar, the natural mother had executed an agreement almost identical in its terms with the one under consideration. Thereafter, and within the six months' probationary period prescribed by statute, she attempted to regain possession of the child and to resume her parental relationship toward it. While holding that execution of the agreement constituted some evidence of abandonment, the learned surrogate held that her subsequent acts in endeavoring to regain possession of the child terminated the effect of her execution of the agreement

and that such termination having occurred prior to the consummation of the adoption and particularly within the probationary period of six months, the mother's consent was an essential prerequisite to the making of an order of adoption. To sustain the contention of petitioners and dispense with the necessity of respondent's executing a consent before the surrogate would defeat one of the fundamental purposes of the statutory requirements, *i. e.*, to protect the rights of the unoffending natural parent or parents. As was stated in *Caruso v. Caruso* (175 Misc. 290, 292): " The natural rights of each parent to his or her child being recognized as sacred, they are jealously guarded and accorded full protection by law. The rights of the parent in the child are paramount." In *Matter of Bistany* (239 N. Y. 19, 24) the Court of Appeals, in referring to the acts necessary to constitute an abandonment, as used in the statute under consideration, stated: " After the finding by the Appellate Division adverse to the petitioners, the order under review must stand unless we are prepared to hold that by acts so unequivocal as to bear one interpretation and one only the parents manifested an intention to abandon the child forever. They may have weakly hesitated. They may have foolishly delayed. They may have drifted into a situation in which their desires and expectations were open to misconception. They may even have experimented a little, to test their own feelings. All that is not enough. They must be found to have renounced. The petitioners would have us hold that what began, so to speak, as a loan, was thereafter transformed into a gift, and this though a readiness to give had been explicitly disclaimed. We cannot say that silence and inaction were prolonged to such a point that an intention to surrender becomes an inference of law."

In *Matter of Norris* (157 Misc. 333, 335), Surrogate DELEHANTY concluded that " only unequivocal and absolute abandonment of the parent " warrants the severance of blood ties. Applying these tests to the facts of the case at bar, I fail to find such evidence of abandonment as would justify the severance of the blood ties between respondent and her child.

As for the second contention, a reading of the statute shows that the consent referred to in subdivision 5 of section 112 is one executed after the foster parents have indicated their willingness to adopt the child and at the time of the institution of the adoption proceeding. Nor can the agreement be treated as a surrender of the child within the meaning of clause 4 of paragraph 1 of section 111; such a surrender can be made only to an authorized agency. In the case at bar the facts clearly indicate there was no surrender to an authorized agency. Furthermore, adoption being a creature of the statute and dependent for its consummation upon approval

of the court, any agreement of the parties or any one of them is necessarily conditional; the parties thereto are powerless to confer upon each other any absolute rights pertaining to the parenthood of a child without complying with the pertinent statutory requirements and securing the approval of the court.

It is further urged that the moral and temporal interests of the child will be promoted by granting the adoption. A consideration of this argument involves the respective rights of the State and the natural parent with respect to the custody of children and has been the frequent subject of comment by our courts. In *Matter of Livingston* (151 App. Div. 1, 7) the court made the following remarks: " While the right of the natural parents to the custody of their children is not a proprietary right in the same sense as if the child were a chattel, and while it is accompanied by a corresponding duty which arises from the relation of parent and child, it has ever been regarded, even in primitive civilization, as one of the highest of natural rights. The State cannot interfere with this right simply to better the moral and temporal welfare of the child as against an unoffending parent. If so, then the State might transfer the handsome child of poor parents to the custody of a childless couple of wealth and moral refinement against the will of the natural parent."

In *Matter of Bistany* (*supra*, 24) the late Judge Cardozo disposed of similar arguments as follows: " Stress has been laid in argument upon the welfare of the child, her prosperity and happiness. We do not dwell upon such considerations, for they are foreign to the issue. We digress merely to state that nothing in this record gives color to a suspicion that the parents are actuated by any sinister design. If the proceeding were habeas corpus, to determine custody alone, there would be need to consider whether the welfare of the child might be held to be controlling. The petitioners ask for more than custody. They seek to make the child their own."

It is conceivable, of course, that granting the adoption might promote the moral and temporal interests of this child. My investigation indicates that petitioners are persons of high standing in their community and have ample financial resources to extend to the child comforts and advantages which otherwise might be denied her. Unfortunately, however, the law does not permit me to give weight to such considerations. The rights of the natural parent are paramount. (*Matter of Livingston, supra; Matter of Bistany, supra.*)

Application is denied.

Settle order accordingly.