In the Matter of Adoption of an ANONYMOUS CHILD.

Surrogate's Court, Monroe County, February 26, 1948.

*William G. Easton* for petitioners.

*Francis A. O'Brien* for respondent.

WITMER, S. Petitioners are husband and wife. The latter, herein referred to as " the wife ", is the natural mother of a girl nearly seven years old when this proceeding was begun, and has joined in her husband's petition to adopt said infant. The wife's first husband has been made respondent, and he objects to the adoption. The second husband, hereinafter referred to as " petitioner ", asserts that respondent lacks the status required to entitle him to object to the adoption, because (1) he is not in fact the father of the child and (2) he has abandoned her. Although respondent has raised a question as to the validity of petitioner's Pennsylvania marriage to the child's mother, it is held that preliminary to determining the merits of the adoptive parents, a determination must be made as to respondent's status and right to object to the proposed adoption.

Respondent and the petitioning wife were married in 1936. In September of 1938 they separated. They had no children at the time. Respondent returned to live with his parents in Rochester, New York, and the wife took a room in a house on Fitzhugh Street, Rochester, New York. Petitioner met the wife about October 1, 1938, and began an illicit relation with her which continued for some months at least. He held sexual relations frequently with her during this period. She had a normal

menstruation in mid-October, 1938, but then became pregnant and had no further menstruations until after the birth of the infant child herein on August 22, 1939. The gestation period and birth were normal (see *Milone* v. *Milone,* 160 Misc. 830). Between December 12, 1938, and the week before Christmas, 1938, respondent and his wife went to live with his parents.

The evidence as to when respondent first found his wife and had possibility of access to her after the separation in September, 1938, is not clear. Two different hearings were had at which testimony was given on this subject. Admittedly the respondent is mentally unstable. When he first took the witness' chair he knew practically nothing about dates, but in other respects he testified to his first meeting with his wife after the separation. His sister was called to supply his lack of memory and she testified in part as follows: " Q. Do you recall the time when George had Patricia return to live with him after their separation in '38? A. Yes, I do. Q. Can you fix the date on which Patricia returned to the Thompson residence? A. Yes; at the time of my mother and father's wedding anniversary, December 12th."

The wife and petitioner testified that respondent and she returned to live together the week before Christmas, 1938. However, when the respondent was called at a later hearing, he testified that he went to live with his wife at Fitzhugh Street about three and a half weeks after they separated, that after three weeks there they moved to a house on Grove Place for a month, and from there to North Street, and thence to his parents' home. He testified that while living with his wife on North Street petitioner visited them, and as a friend helped to install a hot-water heater in the kitchen. The testimony of the wife tends to confirm that she and respondent did live together on Fitzhugh Street and on Grove Place. The petitioners do not deny the incident on North Street. Respondent claims that the above changes of residence occurred prior to the return to his parents on December 12th, of which his sister testified as above quoted; and such claim has not been directly refuted.

Respondent himself stated that his wife did not have a menstruation period after she returned to live with him prior to the birth of the child, and that while living with her on Grove Place he learned that she was pregnant, but she did not then tell him that it was by another man. So far as petitioner knew, respondent never saw or had access to the wife from Octo-

ber 1st, until the time that she resumed living with respondent. Petitioner knew that the wife was pregnant and believed that he was the father. They talked over the matter and decided that in order to avoid the stigma of illegitimacy the wife should return to respondent, and she did that. Petitioners now seek to undo what they thus planned and effectuated.

Prior to the child's birth and for at least many months thereafter, the wife never told respondent that petitioner was the father. About three months after the birth of the child, the wife had her baptized in the Catholic Church, and gave respondent's name as the father. (Respondent and petitioner are not Catholics.) Petitioner continued to visit the wife regularly after her return to respondent, and on some of such occasions the latter was present. Respondent says that petitioner brought his housekeeper with him and thus misled him as to his purposes. Petitioner contributed weekly to the wife's support during the pregnancy and after the child's birth, until the fall of 1941, when the wife and child left respondent permanently to live with petitioner.

Late in the fall of 1941, respondent instituted an action for divorce against his wife and obtained an interlocutory decree of divorce on January 30, 1942, which became final in due course. Prior to entry of the decree respondent and the wife discussed the matter of custody, and the wife insisted upon having the child and indicated that she did not need respondent's support for the child. The decree contained no provision for custody or support of the child and she remained in the wife's custody. Under an oral agreement made at that time, the wife then began the practice of taking the child to visit respondent and his parents, regularly at first, irregularly later.

Petitioner married the wife in Pennsylvania on November 16, 1942. They have two children besides the child referred to in this proceeding, both boys, now five years old and two years old respectively. Respondent remarried on May 18, 1946, and is living with his second wife at the home of his parents.

Respondent's father is a physician and delivered the child herein. Neither he nor his wife would come into court to assist respondent in this proceeding. What he thought about the matter is evident from the fact that directly after the child was born he had a blood test made at Strong Memorial Hospital of the respondent, the wife and the child. The report to him thereon is in part as follows: " With the findings in this case, it is not possible to exclude * * * (respondent) as the

father * * * ''. Respondent's evidence also indicates that his mother doubts that he is the father of the child herein.

At respondent's request petitioner has also submitted to a blood test, which likewise revealed that he could not be excluded as the possible father. Thus the blood tests are of little value herein. (For a discussion of the use of blood tests as legal proof, see *Matter of Swahn,* 158 Misc. 17; and *" Saks "* v. *" Saks",* 189 Misc. 667; and see Domestic Relations Law, § 126-a, *V.* v. *V.,* 179 Misc. 970; 1 Warren's Heaton on Surrogates' Courts [6th ed.], § 101, par. 4, subpar. [e], p. 613.)

Some months after respondent procured the divorce he was inducted into the army. Although the child had lived with him during the first two years of her life and was about three years old at the time of his induction, respondent did not report to the army that she was his dependent, and no allotment was made by the army for her benefit. Respondent was released from the army after a very few months, because of his mental disability. Except for the period in which she lived with him, respondent has never contributed to the support of the child herein; and there is no evidence that he has as much as sent her a Christmas or birthday present or card. He has not seen her in two years, except in court, and has not communicated with her. His second wife does not know her. He does not now seek her custody, or contemplate doing so or plan to contribute to her support or to give her the benefit of his parenthood at any foreseeable future time, but asserts only the bare right to keep the door open for him to do this later.

On the other hand, although petitioner's morality record in this case is far from exemplary, his attachment and devotion to the child cannot be doubted. From the first he has not only contributed to the support of the wife and child but has insisted on his right and duty to do so, and has wholly supported the child since September, 1941.

From observation of the respondent, the petitioner, the child and the other two acknowledged children of petitioner and wife, and from all the evidence herein the court is of the opinion that petitioner is in fact the father of the child in question. The court is also inclined to believe that respondent's position here is taken against the wishes and advice of his parents, not to mention his second wife, and is taken more to spite his first wife and petitioner than from any desire to retain his rights in the child for any other purpose. It is a situation not greatly unlike that of the dog in the manger.

Under the circumstances it seems that the best interests of the child require that she be permitted to live with her mother and petitioner. But this is not a proceeding to determine custody merely (*Matter of Bistany,* 239 N. Y. 19, 24) although that would normally follow if the adoption were granted. While promotion of the interests of the child is essential to approval of an adoption, the natural right of the parent will not be interfered with, even to better the moral and temporal welfare of the child, against the right of an unoffending parent. (*Matter of Bistany, supra; Matter of Martin,* 268 App. Div. 1069; *Matter of Livingston,* 151 App. Div. 1, 7; *Matter of Paden,* 181 Misc. 1025, 1026; *Caruso* v. *Caruso,* 175 Misc. 290; *Matter of Marks,* 159 Misc. 348.) We must therefore determine the status of the respondent.

Is the respondent the father of the child in this proceeding? Upon this question no consideration can be given to the direct testimony of the wife or of respondent concerning their non-access to each other during the period of conception. (*Commissioner of Public Welfare* v. *Koehler,* 284 N. Y. 260; *V.* v. *V.,* 179 Misc. 970, *supra; Admire* v. *Admire,* 180 Misc. 68.) But despite the provisions of section 349 of the Civil Practice Act the wife's voluntary testimony of her adultery with petitioner is admissible (*Rivett* v. *Rivett,* 270 App. Div. 878); and testimony of her statements and conduct in October and November, 1938, concerning her alleged pregnancy, to the extent that they constitute '' verbal acts '', are admissible '' ' as a part of a series of *res gestae,* to throw light upon and to lead to a just conclusion upon a question on which they [she] would not directly be permitted to give evidence' ''. (*Matter of Findlay,* 253 N. Y. 1, 12.)

Nevertheless, the presumption of legitimacy is '' one of the strongest and most persuasive known to the law '' (*Matter of Findlay, supra,* p. 7), and '' will not fail unless common sense and reason are outraged by a holding that it abides. If husband and wife are living together in the conjugal relation, legitimacy will be presumed though the wife has harbored an adulterer [citations]. It may even be presumed though the spouses are living apart if there is a fair basis for the belief that at times they may have come together. Whether such a basis exists in any given instance is to be determined, however, in the light of experience and reason. The presumption does not consecrate as truth the extravagantly improbable, which may be one, for ends juridical, with the indubitably false (cf. *Matter of Case,* 214 N. Y. 199, 204).'' (*Matter of Findlay, supra,* p. 8.) The presumption has been so strong that the above quotation has been considered a most liberal pronouncement.

The facts in this case fall within those contemplated in the foregoing quotation. Admittedly, petitioner was an adulterer with the wife, and she became pregnant during such period. Has petitioner satisfactorily established that respondent had no access to the wife during said period? In view of the presumption and the burden of proof, and in view of the doubtful state of the record as to when respondent reunited with his wife, I am unable to hold that there is no reasonable possibility that respondent had access to the wife during the period of her conception. As to this point, of course, the wife's testimony is excluded. As before indicated, I am of the opinion that in fact the respondent did not have access and that he is not the father; but the presumption of legitimacy is so strong that it stands unless and until it can be said that there is no reasonable possibility of access during the period of conception. This the petitioner has not shown; and I hold that the respondent is the father of the child herein.

Has the respondent abandoned the child? On this issue, also, the petitioner has the burden of proof. (*Matter of Paden,* 181 Misc. 1025, 1027, *supra; Matter of Marks,* 159 Misc. 348, *supra.*) As shown above there is much evidence that the respondent has exhibited little regard for the child, and there is little evidence of any act of parenthood on his part in his relations toward her. Still, there are peculiar circumstances here, which may be called extenuating circumstances, tending to justify or at least excuse respondent's conduct toward the child and to negate the natural assumption of abandonment which would otherwise arise from such conduct. At the time of the divorce the wife insisted upon having custody of the child, and this was agreed to and acquiesced in by the respondent by the omission of any provision for custody in the decree. The agreement concerning the custody was act of parental control and did not constitute an abandonment. For some years the child was brought for visitations to the home of respondent and his parents. Respondent was unmarried from 1942 until May of 1946. After his marriage he drove by petitioners' home to see where the child lived. Petitioners saw him and being fearful of what might be in his mind overtook him and warned him against seizing or seeing the child. Apparently, as a consequence, petitioners then instituted this proceeding. Respondent has made no attempt to see the child since. He has not contributed to the child's support because, he states, he believed that the money would be misappropriated. There is no proof that respondent was or is finan-

cially unable to support the child. Although he appears to have little, if any, earning capacity, it is asserted that his father is trustee of a trust in his favor and attends to his financial needs. At any rate, it appears that at the time of the divorce negotiations the wife indicated that she did not require his support for the child; and there is no proof that he was ever asked to contribute support, or that it would have been accepted if offered, or that he would have refused support had the child been in need. The respondent's mental condition must also be considered in connection with the question of abandonment. Thus, although his position with respect to the child has been for the most part negative, it cannot be said as a technical proposition of law that he has renounced and abandoned her so as to be deprived of all parental rights. (*Matter of Bistany*, 239 N. Y. 19, *supra; Matter of Willing*, 271 App. Div. 935, ▮ revg. 43 N. Y. S. 2d 834; *Matter of Paden*, 181 Misc. 1025, 1027–1028, *supra; Matter of Anonymous*, 178 Misc. 142; *Matter of Cohen*, 155 Misc. 202.)

In a similar situation it was said: " if the natural father could bring himself to consent to the adoption, the interest of the child may be expected to be enhanced." (*Caruso* v. *Caruso*, 175 Misc. 290, 294, *supra*.) This court can do no more at this time than to express a like sentiment.

The petition is, therefore, dismissed.

Submit order accordingly.