Mario Pittoni, J.
This is a proceeding based upon a petition for the return of an infant male child to the natural mother. It was begun by the issuance of a writ of habeas corpus directed against Dr. E. M. on or about July 9, 1957, and a later writ directed against the present respondent, on or about August 21, 1957. Hearings were thereafter had in September and October, and briefs were thereafter exchanged.
On October 10, 1956 a male child was born to an unmarried girl of 18 and a half, the petitioner. The child was delivered by Dr. E. M. who was the petitioner’s family doctor and also the respondent’s family doctor.
According to Dr. E. M. there was a conversation among the petitioner, her mother, and himself in August, 1956. They discussed the impending birth of the child, and the two women, the petitioner and her mother, expressed the desire to give the expected child away for adoption. Dr. E. M. tried to discourage this procedure.
Later, when baby was horn, the petitioner and her mother again told Dr. E. M. they wished to give the baby away for adoption. This testimony by Dr. E. M. is corroborated to a certain extent by L. J., the former attorney for the respondent, who spoke to the petitioner and her mother at the hospital on October 13, 1956, three days after the birth of the child. He testified that he told the petitioner and her mother that he represented persons who wanted to adopt the baby and that the petitioner and her mother stated that they could not keep the child. The petitioner and her mother, however, insist that in conversations with Dr. E. M. and L. J. they understood that the child was to be given away only for temporary custody and that the petitioner would have the right to decide within a year as to the final disposition of her child. The petitioner and her mother insist that all their conversations with Dr. E. M. and L. J. took place while they were in a state of mental confusion. Be that as it may, the baby was delivered to Dr. E. M. ’s office four days after birth, and the very same day Dr. E. M. turned the child over to a representative of the respondent. No - documents of any kind were ever signed for the transfer or custody of the child. The hospital and medical bills for the birth and after care were paid for by petitioner’s parents.
On or about Election Day in November, 1956, at the request of L. J., the petitioner’s mother sent him the baby’s birth *1078 certificate. It seems that there was another conversation thereafter between L. J. and the petitioner’s mother, wherein the mother suggested that they send some Christmas presents to the baby and L. J. dissuaded her from doing so.
Thereafter, the petitioner asked for the return of the baby. According to her, “ In November I went back to Dr. E. M. and I expressed my desire to have the baby back.” Dr. E. M. stated, in response to a question, “ When is the first time that you knew, if at all, that she wanted the baby back? ” * * * “ Around February of 1957.” Dr. E. M. also admits that in January, 1957 the petitioner did ask him where the baby was. L. J. also says that the petitioner’s mother told him in February by telephone and in early March in person that the petitioner wanted her baby back. Several discussions then did follow in April and May among the petitioner’s parents, L. J., and an attorney for the petitioner and her parents. These all concerned the demand by the petitioner and her parents that the baby be returned.
There is no evidence of any kind to show any mercenary or ulterior motive involved in these demands. In fact, the petitioner’s father is the manager of a store at a salary of $9,000 per year, and her mother is also employed at a fair salary. Both her mother and father expressed desire to take the child into their home and to care for the child and the petitioner.
The basic law involved in this case is stated best by Judge Fuld in People ex rel. Kropp v. Shepsky (305 N. Y. 465, 468-470):
“ It has often been said that a child’s welfare is the first concern of the court upon a habeas corpus proceeding, where the judge acts ‘ as parens patriae to do what is best for the interest of the child. ’ (Finlay v. Finlay, supra, 240 N. Y. 429, 433; see, also, People ex rel. McCanliss v. McCanliss, 255 N. Y. 456; People ex rel. Pruyne v. Watts, 122 N. Y. 238, 242.) However valid this statement may be in a contest for custody involving the parents alone, it cannot stand without qualification in a contest between parents and nonparents. The mother or father has a right to the care and custody of a child, superior to that of all others, unless he or she has abandoned that right or is proved unfit to assume the duties and privileges of parenthood. (See, e.g., People ex rel. Portney v. Strasser, supra, 303 N. Y. 539, 542; People ex rel. Beaudoin v. Beaudoin, 193 N. Y. 611, affg. 126 App. Div. 505; Matter of Livingston, 151 App. Div. 1, 7; cf. Matter of Gustow, 220 N. Y. 373.) Accordingly, we have sanctioned withholding the child from the custody of a parent who has abandoned or transferred the parental right, either expressly or by *1079 implication. (See, e.g., Matter of Benning [Nigro], 303 N. Y. 755; Matter of Gustow, supra, 220 N. Y. 373, cf. Matter of Bock [Breitung], 200 N. Y. 349; Matter of Stuart, 280 N. Y. 245.) And, quite obviously, a parent who is ' a drunkard, an incompetent, a notoriously immoral person, cruel or unkind towards his child ’ (Matter of Gustow, supra, 220 N. Y. 373, 377), may have the child taken from him.
“ Apart, however, from such special and weighty circumstances, the primacy of parental rights may not be ignored. In no case may a contest between parent and nonparent resolve itself into ‘ a simple factual issue as to which [affords] the better surroundings, or as to which party is better equipped to raise the child. ’ (People ex rel. Portnoy v. Strasser, supra, 303 N. Y. 539, 542.) And that is true even if the nonparent initially acquired custody of the child with the parent’s consent. (See, e.g., People ex rel. Beaudoin v. Beaudoin, supra, 126 App. Div. 505, 507, affd. 193 N. Y. 611; cf. Matter of Bistany, 239 N. Y. 19.)
‘ ‘ Except where a nonparent has obtained legal and permanent custody of a child by adoption, guardianship or otherwise, he who would take or withhold a child from mother or father must sustain the burden of establishing that the parent is unfit and that the child’s welfare compels awarding its custody to the nonparent. (See, e.g., People ex rel. Portnoy v. Strasser, supra, 303 N. Y. 539, 542; Matter of Gustow, supra, 220 N. Y. 373.) Where consent initially given to a child’s adoption, often under the pressure of circumstances, is thereafter withdrawn (see e.g., Domestic Relations Law, § 112, sub. 7), the case falls within the rule and not within the exception. In other words, the burden rests, not, for instance, upon the mother to show that the child’s welfare would be advanced by being returned to her, but rather upon the nonparents to prove that the mother is unfit to have her child and that the latter’s well-being requires its separation from its mother. (Cf. Matter of Bock [Breitung], supra, 280 N. Y. 349, 353; Matter of Thorne, 240 N. Y. 444, 449-450; Matter of Bistany, supra, 239 N. Y. 19, 24.) ”
The method by which the child was transferred in this case from the unmarried mother to the custodial parents should be discouraged. The taking of an infant child, even with the natural mother’s consent, at a time when she is still under the threat or lash of public disapproval and the mental insecurity engendered by such a state of facts; and the transferring of the custody of that infant child to others merely because of their gréat desire for an infant child, without any legal proceeding or documentation of any kind, is unwarranted. treatment of a newborn human being.
*1080 It is true that the motives of the respondent and his wife were of the highest. In fact, the court is sympathetic with their desire to obtain another child as a companion for their older adopted child. However, their actions would have been more commendable if they had followed the more approved method of obtaining the custody of a child through an authorized agency and through more legal channels, as they did in obtaining custody of their first adopted child. Again, this method of transferring a newborn human being from the natural mother to others merely because of their desire to have another child cannot be approved.
The respondent and his wife have expressed a desire to adopt the child. However, the consent of the mother of a child born out of wedlock is required for adoption by others. (Domestic Relations Law, § 111, subd. 3.) It is true that such a consent is not required of a parent ‘' who has abandoned the child or who has surrendered the child to an authorized agency for the purpose of adoption under the provisions of the social welfare law.” (Domestic Relations Law, § 111.) But in the language of Surrogate Delehanty, in Matter of Norris (157 Misc. 333, 335-336): “ Only unequivocal and absolute abandonment of the parent” warrants the severance of blood ties. And in the language of Judge Cardozo, in Matter of Bistany (239 N. Y. 19, 21): “ To prevail they must be able to show that even though the parents be given the benefit of every controverted fact, a finding of abandonment follows as an inference of law”. And still using Judge Cabdozo’s language in its application to this case (p. 23), “ We are unable to yield to the * * * contention that the facts above recited point so decisively to an abandonment that every other inference must be held to be excluded ’ ’. In short, this court is not satisfied that the facts establish an abandonment.
The respondent and his wife are persons of good standing in the community and have ample financial resources to extend to the child comforts and advantages which might be superior to that which can be afforded by the petitioner and her parents. However, the law does not permit great weight to such considerations. The rights of the natural parent are paramount. (Matter of Bistany, 239 N. Y. 19, 24, supra.)
The fact that the respondent and his wife have expended money in nurturing this child, and have developed a great and possibly overwhelming or unusual love for this child does not permit this court in the absence of unusual circumstances to deprive the natural parent of her legal right to custody. The court realizes that the respondent and his wife will suffer untold *1081 mental anguish if they are required to surrender the child; but they must have realized such a possibility, yes, even probability, when they took custody under the circumstances of this case.
The respondent has offered evidence through several witnesses of the petitioner’s immoral conduct prior to and even after her pregnancy. It was this very immoral conduct which gave rise to the situation now under consideration. This conduct, of course, cannot be condoned. However, it was during the petitioner’s adolescence, which the law recognizes as a period when mature moral strength has not been attained. The evidence is not sufficient to show her unfitness at this time. She is now 19 years of age.
The respondent contends that if the petitioner is given custody of the child she and she alone will be able to determine the child’s disposition in the future. That is not a correct statement. The court upon application of the proper governmental agency may at any time intervene to secure the proper welfare of the child.
The contention that the respondent and his wife can give the child the greatest love and care meets this obstacle: the respondent and his wife during the hearing saw and observed the natural mother and the alleged father of the child; their attitude toward and love for the child is bound to be affected by what they saw and heard and by what they now know of the natural parents.
It is clear to this court under the principles of People ex rel. Kropp v. Shepsky (305 N. Y. 465, 468, 470, supra); People ex rel. Portnoy v. Strasser (303 N. Y. 539, 542) and Matter of Bistany (239 N. Y. 19, 21, supra) that the writ should be and hereby is sustained. The child shall be delivered to the custody of the natural mother, the petitioner.
The court further orders that the papers in this case, together with the decision herein, be filed in the County Clerk’s office and sealed. No persons other than the parties hereto or their duly authorized attorneys may hereafter inspect these documents except by order of the court.
Settle order on notice.