HENRY GALLY, JUNIOR, & another, petitioners.

Norfolk.   January 11, 18, 1952. — June 23, 1952.

Present: QUA, C.J., RONAN, WILKINS, SPALDING, & WILLIAMS, JJ.

*Adoption. Probate Court*, Report of evidence, Report of material facts,
  Appeal, Adoption proceeding. *Words*, "Must," "Practicable."

On appeal from a decree of a Probate Court, the case was treated as
  before this court on the evidence where the trial judge, in making a
  report of material facts as requested, irregularly but without objection
  incorporated all the evidence, which was wholly documentary, in the
  report.  [145]
Where the evidence reported on an appeal from a decree of a Probate
  Court is wholly documentary, this court is in the same position re-
  specting original findings of fact as was the trial judge.  [145]
In a proceeding for adoption of a child since the enactment of G. L.
  (Ter. Ed.) c. 210, § 5B, inserted by St. 1950, c. 737, § 3, all the factors
  bearing on the ultimate test of the child's welfare are still to be con-
  sidered, but the statute requires that controlling effect be given to
  the factor of identity of religious faith "when practicable."  [147–149]
On appeal from a decree of a Probate Court denying on the ground of
  G. L. (Ter. Ed.) c. 210, § 5B, inserted by St. 1950, c. 737, § 3, a peti-
  tion for adoption of a girl of tender years by petitioners of a religious
  faith different from that of the girl's mother, where this court on the
  record was in the same position respecting original findings of fact as
  the trial judge, it was determined that in view of all the circumstances,
  including birth of the girl under unfortunate conditions and with poor
  prospects, her residence with the petitioners since shortly after her
  birth, suitability of the petitioners, their ability to provide her with a
  fine home, good care, an education and other advantages, consent of
  her mother to a "change in religion," and absence of evidence that
  anyone of the same religious faith as the mother was seeking to adopt
  the girl or would offer to do so, it was not "practicable . . . [to]
  give custody only to persons of the same religious faith as that of the
  child" within said § 5B, and that the adoption by the petitioners
  should be allowed.  RONAN, J., dissenting.
If the second paragraph of G. L. (Ter. Ed.) c. 210, § 5B, inserted by
  St. 1950, c. 737, § 3, has any application to decrees of the Probate
  Court after rescript, there would be compliance with that paragraph
  by stating in a decree after rescript allowing an adoption that the
  decree was in accordance with the rescript.  [150]

· Petition, filed in the Probate Court for the county of Norfolk on July 10, 1950.

The case was heard by *Hickey*, J.      ·

*John F. Lombard*, for the petitioners.

*Shad Polier & Leo Pfeffer* of New York & *Gerald A. Berlin*, by leave of court, submitted a brief as amici curiae.

Qua, C.J.   This is a petition filed in the Probate Court for the adoption of Dana Lee Morgan, otherwise known as Dana Lee Rocci, a girl now about two years old. The petitioners are Henry Gally, Junior, and his wife. The mother of the child has signed the petition, consenting "to the adoption, as above prayed for," and her consent has been attested before a notary public.   G. L. (Ter. Ed.) c. 210, § 2, as appearing in St. 1950, c. 737, § 1.   There was no appearance in opposition to the petition.   ·The trial judge, although he found that the child was "a proper subject for adoption"; that "the petitioners and their · home are suitable for the proper rearing of the child"; and that they are "of sufficient ability to bring up the child and provide suitable support and education for it," nevertheless denied the petition for the reason, as appears in the decree, "that the petitioners are of a religious faith other than that of the mother of the child."   The decree further indicates that he came to this conclusion "in view of the provisions of" G. L. (Ter. Ed.) c. 210, § 5B, inserted by St. 1950, c. 737, § 3, hereinafter quoted in full.   The petitioners appeal.

The petitioners requested a report of material facts in accordance with G. L. (Ter. Ed.) c. 215, § 11, as amended by St. 1947, c. 365, § 3.   The judge made a report in which he recited certain facts as to the nature of the proceeding, apparently taken from the files or docket, made certain findings of facts, and then incorporated in his report several photographs of the petitioners' home and the report from the department of public welfare required to be submitted to the Probate Court by G. L. (Ter. Ed.) c. 210, § 5A, as appearing in St. 1950, c. 737, § 2, and stated that no evidence other than the photographs and the department's report was submitted for the consideration of the court.

The report of the judge is in an unusual form. A request for a report of material facts under the statute does not call for a report of any evidence, documentary or otherwise. *Sidlow* v. *Gosselin*, 310 Mass. 395, 396–397. *Matter of Santosuosso*, 318 Mass. 489, 495. But the judge states that he has reported all the evidence. The situation is that we actually have before us all the evidence submitted to the court below. The appellants, who presumably have paid for the printing of this evidence, are not objecting to its inclusion by the judge in his report and are using it in their brief. No other party has ever appeared in the case. The requirement by statute and rule of a request for a report of evidence applies only to testimony taken orally. G. L. (Ter. Ed.) c. 215, § 12; c. 214, § 24, as amended by St. 1947, c. 365, § 1. Rule 17 of the Probate Courts (1934). In these circumstances it would seem a barren technicality to say that we could not consider the evidence because it was irregularly included in a statutory report of material facts. *Granger* v. *Bassett*, 98 Mass. 462. *Curley* v. *Boston*, 312 Mass. 58, 61–62. We treat the case as before us on the evidence. Moreover, since the evidence was wholly documentary, we are in as favorable a position to make original findings of fact as the trial judge was and must therefore exercise our own judgment as to both facts and law. *Brockton Olympia Realty Co.* v. *Lee*, 266 Mass. 550, 562–563. *Paloeian* v. *Day*, 299 Mass. 586, 587–588. *Veazie* v. *Staples*, 309 Mass. 123, 127. *Fiduciary Trust Co.* v. *Mishou*, 321 Mass. 615, 631. *Attorney General* v. *"Forever Amber,"* 323 Mass. 302, 309.

The case therefore comes to us in a peculiar way and is in a different position from that of the ordinary appeal from a decree founded upon oral evidence.

Except for the photographs hereinbefore mentioned, the only source for any findings of fact in the case is the report by the department of public welfare to the Probate Court, which was admitted in evidence. From that report these facts appear: The mother of the child is of English ancestry. She is between twenty-four and twenty-five years of age.

The child to be adopted is the mother's third child by her mother's husband, her own stepfather, with whom she has been living. He is also her adoptive father. He is of Italian ancestry. He has a considerable criminal record, the details of which need not be stated. His education did not extend beyond the sixth grade. He deserted from the army in 1926. The report says that his "occupation is unknown but is officially listed as 'importer.'" The petitioner Henry Gally, Junior, is about forty years of age. He is of "English-Austrian" ancestry. He is a graduate of Cornell University in civil engineering. He served for several years in the "Engineer's Corps" of the army, from which he was discharged in 1946, with the rank of major. At the time the report was made he was employed by a construction company as superintendent at a salary of $10,000 a year. His wife, the other petitioner, is of "German-Scotch-Irish" ancestry. She is a graduate of a junior college. She is about thirty-four years of age. Both petitioners are in good health. They have been married since 1941 and have no children. The petitioners own the six room house in which they live in "a quiet residential section" of Wellesley Hills. They paid $17,700 for it. There is a mortgage upon it of $6,500. It is "beautifully furnished and immaculately kept." The photographs show a comfortable home, with large yard space and many trees scattered about. "Financial assets include life insurance with a total [value] of $30,000 in principal sum, and government bonds with maturity value of $1,500. References are excellent." The child was placed with the petitioners when she was about three weeks old "after a brief placement in a boarding home." At that time she was ill "because of feeding difficulties" and was "troubled by colic" until three months of age. "Since then she has been well and is certainly receiving the best of care including routine checks by a pediatrician." She has her own nursery. The petitioners are of a religious faith different from that of the child's mother. The department's report, however, says that the mother "stated that she has no objection to the change in religion."

The statute, G. L. (Ter. Ed.) c. 210, § 5B, inserted by St. 1950, c. 737, § 3, by reason of which the trial judge apparently felt himself bound to deny the petition, reads as follows:

"In making orders for adoption, the judge when practicable must give custody only to persons of the same religious faith as that of the child. In the event that there is a dispute as to the religion of said child, its religion shall be deemed to be that of its mother.

"If the court, with due regard for the religion of the child, shall nevertheless grant the petition for adoption of a child proffered by a person or persons of a religious faith or persuasion other than that of the child, the court shall state the facts which impelled it to make such a disposition and such statement shall be made part of the minutes of the proceedings."

Before the insertion of this section the guiding star in cases of adoption of a young child, as well as in other cases involving child custody, was the welfare of the child. "The first and paramount duty is to consult the welfare of the child." *Purinton* v. *Jamrock*, 195 Mass. 187, 199. *Commonwealth* v. *Ball*, 259 Mass. 148, 151. *Hersey* v. *Hersey*, 271 Mass. 545, 555. *Richards* v. *Forrest*, 278 Mass. 547, 553–554. *Merrill* v. *Berlin*, 316 Mass. 87, 89. *Grandell* v. *Short*, 317 Mass. 605, 608. *Erickson* v. *Raspperry*, 320 Mass. 333, 335. *Wilkins* v. *Wilkins*, 324 Mass. 261, 262. *Allen* v. *Allen*, 326 Mass. 214, 216. *Krakow* v. *Department of Public Welfare*, 326 Mass. 452, 455–456. Nevertheless, it was held to be "the general policy of the Commonwealth to secure to those of its wards who are children of tender years the right to be brought up, where this is reasonably practicable, in the religion of their parents. . . . The wishes of the parent as to the religious education and surroundings of the child are entitled to weight; if there is nothing to put in the balance against them, ordinarily they will be decisive. If, however, those wishes cannot be carried into effect without sacrificing what the court sees to be for the welfare of the child, they must so far be disregarded. The court

will not itself prefer one church to another, but will act without bias for the welfare of the child under the circumstances of each case." *Purinton* v. *Jamrock*, 195 Mass. 187, 199–200. See also, G. L. (Ter. Ed.) c. 210, § 5A, as appearing in St. 1950, c. 737, § 2.

It does not seem to us that when the Legislature inserted § 5B it intended to cast aside the familiar and obviously pertinent criteria which had been so long employed in determining questions of child custody, not only here but in other jurisdictions as well. See cases cited in 2 C. J. S. Adoption of Children, 425. It was not intended that identity of religion should be the sole or necessarily the principal consideration. There is, however, a certain element of compulsion upon the judge indicated by the word "must." But the compulsion operates only "when practicable." The similarity of this expression to the expression "where this is reasonably practicable" used in the leading case of *Purinton* v. *Jamrock*, from which we have hereinbefore quoted, can hardly pass unnoticed. Yet the statute is not to be construed as if, instead of saying "when practicable," it had used the common expression "other things being equal." The compulsion goes somewhat beyond the point where factors other than religious faith are in even balance. Practicability is made the test. "Practicable" is not synonymous with convenient. *Legere* v. *Tatro*, 315 Mass. 141, 147. "Practicable" means feasible — capable of being put into useful practice. As employed in § 5B we think it carries the thought of practical suitability in relation to existing conditions. *Gilmartin* v. *D. & N. Transportation Co.* 123 Conn. 127, 132–133. *Walbridge* v. *Brooklyn Trust Co.* 143 App. Div. (N. Y.) 502, 508. "The phrase 'if the court shall find it practicable' implies a legal discretion, the exercise of judgment based upon the whole evidence of all the facts that affect the question of practicability within the usual and ordinary sense of the word. The question therefore depends upon the circumstances of each particular case." *Pittsburgh, Cincinnati, Chicago & St. Louis Railway* v. *Indianapolis, Columbus & Southern Traction Co.* 169 Ind. 634,

637. "Whether a thing is 'practicable' depends upon the actualities, — the very facts and circumstances of the case." *Gifford* v. *New Amsterdam Casualty Co.* 216 Iowa, 23, 24. All of the familiar tests are therefore still to be considered. Each case is to be determined on its own facts. The difference is that, whereas before the new statute there was no definite rule binding upon the judge in any set of circumstances as to how much weight was to be given to any one of the several elements as against the others, he is now bound to give controlling effect to identity of religious faith "when practicable," but not otherwise. See *Guardianship of Walsh*, 100 Cal. App. (2d) 194; *In re Adoption of Duren*, 355 Mo. 1222, 1236; *Butcher's Estate*, 266 Pa. 479; *In re Adoption of an Anonymous Child*, 195 Misc. (N. Y.) 6; 22 A. L. R. (2d) 710–714. Compare *In re Santos*, 278 App. Div. (N. Y.) 373, but see note 65 Harv. L. Rev. 694.

In the case before us we have a girl baby born under unfortunate conditions. Her prospects for a healthy, normal, and happy childhood and adolescence were poor. When about three weeks old, she was in a boarding home and was ill. The petitioners took her to their home, nursed her to health, and have kept her since, giving her "the best of care" in pleasant healthful surroundings. They desire to keep her permanently as a member of their family and are able to give her a good home, a secure life, and the advantages of an education. The opportunity for this child seems to us an unusual one. To deprive her of it would be to assume grave responsibility. The child's mother, the only parent whose consent is necessary in the circumstances (G. L. [Ter. Ed.] c. 210, § 2, as appearing in St. 1950, c. 737, § 1), has consented to the adoption and does not object to a change in religion. No person or persons of the same religious faith as the child's mother are seeking to adopt this child. There was no evidence that any such person or persons would offer to do so. That remains only a doubtful possibility; and there is also always present the other possibility that the child might have to be reared at the expense of the State or of private charity. In view of all the circum-

stances it would not be "practicable" in this instance to "give custody only to persons of the same religious faith as that of the child."

It has been argued on various grounds that G. L. (Ter. Ed.) c. 210, § 5B, inserted by St. 1950, c. 737, § 3, as applied to this case in the trial court, is unconstitutional. We have not reached that question and intend no implication in respect to it.

In entering the decree hereinafter ordered the statement that the decree is in accordance with the rescript of this court will in itself constitute compliance with the second paragraph of § 5B, if that paragraph has any application at all to decrees after rescript.

The decree is reversed and the case is remanded for the entry of a decree allowing the adoption of the child by the petitioners as prayed for.

*So ordered.*

RONAN, J. I do not agree with the majority opinion which reverses a decree dismissing a petition for adoption of a girl less than two years of age and decides that the evidence justifies the granting of a decree for adoption when, so far as appears, nothing was presented in what seemingly was an ex parte hearing[1] in the Probate Court other than some photographs of the dwelling house of the petitioners and a report from a supervisor of the department of public welfare. The photographs do not add much to the case for the important thing in view of the nature of this proceeding is not the beauty of a house but the character of a home. Apart from the pictures, the report furnishes the only evidence. The matters disclosed by the report have been stated in the majority opinion and need not be repeated. Our inquiry is whether they require the granting of the adoption.

It is necessary first to ascertain the meaning of the pertinent statute, G. L. (Ter. Ed.) c. 210, § 5B, inserted

---

[1] A hearing may be held in chambers. G. L. (Ter. Ed.) c. 210, § 6, as amended by St. 1950, c. 737, § 4.

by St. 1950, c. 737, § 3, and then to determine whether the evidence appearing upon this meager record entitles the petitioners to a decree for adoption. The statute, § 5B, provides: "In making orders for adoption, the judge when practicable must give custody only to persons of the same religious faith as that of the child. In the event that there is a dispute as to the religion of said child, its religion shall be deemed to be that of its mother. If the court, with due regard for the religion of the child, shall nevertheless grant the petition for adoption of a child proffered by a person or persons of a religious faith or persuasion other than that of the child, the court shall state the facts which impelled it to make such a disposition and such statement shall be made part of the minutes of the proceedings." Petitions for adoption do not spring from the common law but are the creatures of a statutory system by which they are governed and controlled, *Davis* v. *McGraw*, 206 Mass. 294; *Lee* v. *Wood*, 279 Mass. 293, and with which there must be substantial compliance before an order for adoption may be entered. *Beloin* v. *Bullett*, 310 Mass. 206. *Zalis* v. *Ksypka*, 315 Mass. 479. *Broman* v. *Byrne*, 322 Mass. 578.

Our statutory system governing adoption originated in St. 1851, c. 324, but from that time up to the enactment of § 5B no specific guide was furnished to the trial judge for treating cases in which there was a difference in the religious beliefs of the parent or parents of the child, as the case might be, and the petitioners, and cases where there was no such difference, although the changes made by § 5B were, more or less, adumbrated by St. 1905, c. 464, now G. L. (Ter. Ed.) c. 119, § 40, providing for the protection of minor wards of the Commonwealth in the free exercise and the full enjoyment of the religion of their parents, and by St. 1931, c. 342 (see now G. L. [Ter. Ed.] c. 210, § 5A, as appearing in St. 1950, c. 737, § 2), providing that the department of public welfare, in conducting its investigation where a petition has been filed for the adoption of a child under fourteen years of age, shall give due

regard to "the race and religion of the child and of the petitioners."

Section 5 of c. 324 of St. 1851 sets forth in general the terms and conditions prerequisite to the granting of an adoption, which, in so far as now material, have remained unchanged. See now G. L. (Ter. Ed.) c. 210, § 6, as amended. For instance, the statute, R. L. c. 154, § 6, which was in force when *Purinton* v. *Jamrock*, 195 Mass. 187, was decided, provided: "If the court is satisfied of the identity and relations of the persons, and that the petitioner is of sufficient ability to bring up the child and provide suitable support and education for it, and that the child should be adopted, it shall make a decree . . . [of adoption]." One of the questions presented in that case was the weight that should be attributed to the matter of religion when the religion of the mother of the child was different from that of the petitioners. It is to be noted that the governing statute made no mention of such a matter which ordinarily might be expected to be inherently involved in situations where there is such a difference. The single justice, whose decision ordering an adoption was affirmed there, specifically found, "This objection [based on the difference in religious faiths] is entitled to consideration, although it does not appear to be of great weight" (page 195). The opinion dealing with this phase of the case stated, "The wishes of the parent as to the religious education and surroundings of the child are entitled to weight; if there is nothing to put in the balance against them, ordinarily they will be decisive. If, however, those wishes cannot be carried into effect without sacrificing what the court sees to be for the welfare of the child, they must so far be disregarded" (pages 199–200). Of course, the final and ultimate test in that case and in every case for adoption of a child has always been to decide what would be for the best interests of the child. That principle has never been departed from and is too well settled in this jurisdiction to need any citation of cases to support it. The statute now calling for interpretation, § 5B, in no way alters or changes this test, and the welfare of the child continues

to be the sole consideration in determining whether a petition for his adoption should be granted or dismissed. The statute just mentioned, however, makes an important change in the weight that must be given by the judge to the religion of the child, where it is different from that of the petitioners, in arriving at his decision as to what disposition should be made of the petition. Each judge, under the statute in accordance with which the *Purinton* case was determined, decided for himself without any legislative guide what weight, little or great, should be allowed to the difference in religious beliefs of the parties. The matter rested in his individual, untrammeled discretion. The governing statute was concerned to a great extent with the economic ability of the petitioners to support and educate the child and with the physical well being of the child, and it did not stress the effect an adoption would have on the child's religion — a matter which many citizens have always deemed to be of prime importance. See, for instance, *Matter of Jacquet,* 40 Misc. (N. Y.) 575; *Matter of Crickard,* 52 Misc. (N. Y.) 63; *Matter of Mancini,* 89 Misc. (N. Y.) 83; *In re Lamb's Estate,* 139 N. Y. Sup. 685; 29 Harv. L. Rev. 485. The operation of the statute in force when the *Purinton* case was decided has been materially changed by being supplemented by the broad and humane provisions of § 5B. Finally, the public policy of this Commonwealth existing at the time of the decision in the last case cited differs from that now existing to the same extent as R. L. c. 154, § 6 (now G. L. [Ter. Ed.] c. 210, § 6), alone differs from said § 6 supplemented by § 5B. In other words, there is now legislative recognition of the importance that the religion of a child under fourteen years of age should have in deciding whether the adoption should be allowed. The difference in religious beliefs was no longer to be treated as an incidental matter. That recognition appears in the form of the statute (§ 5B) setting forth a strong and persuasive directive to the courts that the judges "when practicable must give custody only to persons of the same religious faith as that of the child." This statute does not prohibit adoption when there is a difference in the re-

ligious faith of the parties, but it does, in such instances, lay down a general rule to be followed in making orders for adoption. It virtually treats this type of cases in which a petition is to be allowed as an exception to the general rule. It urges caution and care on the part of the trial judge before granting an adoption. It makes certain that, before he decides to allow the petition, he has given the case mature consideration and adequate deliberation, which have resulted in a settled conviction, because the statute requires him to spread upon the record the reasons that impelled him to grant the adoption. The Legislature obviously intended that the power to make such a decision should be sparingly exercised. The only instances in which the petitions were to be granted were where the evidence was such that the judge was impelled or constrained to do so. The statute does not change existing law in that the ultimate object to be accomplished is the welfare of the child, but it emphasizes in no uncertain terms that due regard must be given to the religion of the child. It provides expressly that, "when practicable," custody of the child must be given, not may be given, "only to persons of the same religious faith as that of the child" and not to any person who might otherwise be fit and suitable. It may properly be assumed that the Legislature had come to the conclusion that according to common experience it was more conducive to the public welfare that the adoption of children under fourteen years of age by persons of a different religious faith should not be allowed other than in rare instances. Preference was to be given to those of the same faith where that was practicable. Section 5B is pregnant with the thought that the denial of such petitions is the rule and their granting the exception. It narrows the limits of judicial discretion by pointing out the manner in which it is to be exercised in order that the decision rendered will not be inconsistent with the public policy of the Commonwealth.

It must also be remembered that the State which has furnished the means and manner in which children may be adopted has a vital interest in the administration of the

laws governing their adoption so that their station in life, as judged by materialistic standards, be raised, and that things, not physical but of a higher nature, which they possess but are too young to appreciate and defend are not unjustifiably or unnecessarily taken from them. The concern of the Commonwealth in the welfare of children is manifested in statutes for compulsory education, the care and supervision of delinquent children, and the strict regulation of child labor, and in many other enactments. See G. L. (Ter. Ed.) cc. 76, 119, 149. A statute prevents all persons other than certain boards, incorporated charitable institutions, and a certain association from advertising in newspapers that they have children for adoption or that children are wanted for adoption, and a person receiving a fee for placing a child for adoption is subject to a penalty. G. L. (Ter. Ed.) c. 210, § 11A, as appearing in St. 1950, c. 737, § 6. *Goodman* v. *District of Columbia*, 50 Atl. (2d) 812. See also *In re Adoption of Jaren*, 223 Minn. 561; *In re Adoption of Anderson*, 235 Minn. 192; *Matter of Hurter*, 111 Misc. (N. Y.) 85; *Hill* v. *Hill*, 104 N. Y. Sup. (2d) 755.

The court now holds that in denying the petition the judge went beyond what was practicable or, in other words, that the only practicable decision that he could reach was to grant the petition. Reliance to support this conclusion is placed upon numerous definitions of the term practicable. This word has various shades of meaning. 72 C. J. S. 467. Perhaps one of its frequent uses is to denote that something can be done with the available means. It is sufficient for present purposes to regard it as denoting some degree of discretion when construed in the setting in which it now appears and when considered in conjunction with the design and aim which the statute in which it is employed seeks to accomplish. *Dickinson Industrial Site, Inc.* v. *Cowan*, 309 U. S. 382. Statutes in many other jurisdictions governing the placing of children in custody provide that their care and supervision should be entrusted to persons of the same religious faith as that of the minor or to an institution con-

trolled by persons of his faith "when practicable," "whenever practicable," "as far as practicable," or some substantially similar phrase.[1]

Our statute, G. L. (Ter. Ed.) c. 210, § 5B, inserted by St. 1950, c. 737, § 3, is a combination of portions of the statutes of New York. One statute, domestic relations law, art. 7, § 113, provides in part that "In making orders of adoption the judge or surrogate when practicable must give custody only to persons of the same religious faith as that of the foster child in accordance with article six of the social welfare law." The article referred to provides, social welfare law, art. 6, § 373, subdivision 3, "In appointing guardians of children, and in granting orders of adoption of children, the court shall, when practicable, appoint as such guardians, and give custody through adoption, only to a person or persons of the same religious faith as that of the child." By subdivision 4 it was provided that "The provisions of subdivision one, two and three of this section shall be so interpreted as to assure that in the care, protection, adoption, guardianship, discipline and control of any child, its religious faith shall be preserved and protected." Subdivision 5 provides that "Whenever . . . letters of adoption of a child are granted to a person or persons whose religious faith is different from that of the child . . . the court . . . shall state or recite the facts which impelled such disposition to be made contrary to the religious faith of the child or to any person whose religious faith is different from that of the child and such statement shall be a part of the minutes of the proceeding . . . ."

I am of the opinion that the words "when practicable" as appearing in our § 5B should be given a meaning similar

---

[1] Cal. (1937) Welfare & Institutions Code, § 551, as amended by St. 1947, c. 533, § 1. D. C. Code (1940 ed.) § 11–918 (52 U. S. Sts. at Large, 601, § 17). Ga. Laws (1951) page 305. Ill. Rev. Sts. (1951) c. 23, § 299b1. Iowa Code (1950) §§ 232.24, 235.3. Minn. Sts. (1949) § 260.20. Mo. Rev. Sts. (1949) §§ 211.140, 457.170. Neb. Rev. Sts. (1943) § 43–216. N. Dak. Rev. Code (1943) § 27–1622. Ohio Code (1948) c. 8, § 1639–33. S. Dak. Code (1939) § 43.0322. Va. Code (1950 Sup.) § 16–172.48. The Pennsylvania Statutes (1936 ed.) Title 11, § 252, provide that custody shall be given to those of the same religious belief "as far as possible."

to the meaning those words have in the New York statutes, and that this is true even if § 5B does not contain any counterpart of subdivision 4 of § 373. That subdivision was simply a precautionary measure that the words "when practicable" in § 113 should be interpreted so as to assure that the religious faith of the child should be preserved and protected, and subdivision 5 of said § 373, a part of which was taken over by our § 5B, was evidently enacted to aid in the accomplishment of that purpose. I am not aware that there is any decision of the Court of Appeals of New York interpreting § 113 and § 373. In *In re Santos*, 278 App. Div. (N. Y.) 373, *S. C.* 279 App. Div. (N. Y.) 578, an order made under the Domestic Relations Court act of the city of New York[1] committing two children to an agency under the mistaken belief that the religious faith of the children was the same as that of the persons who controlled the agency, when it was discovered that their religion was different, was revoked. The court, relying on § 86, subdivision 3, and § 88, subdivisions 1 and 5, of the court act, considered these provisions as constituting a legislative mandate which left "no area for judicial discretion. It was and still is practicable to give these infants to an institution under the control of persons of their religious faith in fulfillment of the statute that their 'religious faith shall be preserved and protected by the court' (N. Y. City Dom. Rel. Ct. Act, § 88, subd. 4). To this the children have a natural and legal right of which they cannot be deprived by their temporary exposure to the culture of another religion prior to the age of reason."

I am inclined to the opinion that, so far as the field specifically covered by § 5B and § 113 and § 373 is common ground, they carry a common meaning in furtherance of a common purpose of emphasizing the weight to be given to the religion of a child in petitions seeking his adoption by those of a different religious belief.

The only evidence submitted to the judge, other than the

[1] Laws of New York, 1933, c. 482.

photographs, was the report of the department of public welfare. There is not a scintilla of evidence contained in it as to whether other available means were not at hand whereby this child could be adopted by persons of her own religious faith. The judge was not required to find that it was not reasonably probable that means were available in the interests of the child other than decreeing adoption to persons even if fit and suitable but of a different religious belief. The petitioners were not entitled to a decree in their favor unless they showed that it was not practical to turn the child over to those of her own religion. The judge was obliged to comply with the directives and the spirit of the statute. In *Adams* v. *Whitmore*, 245 Mass. 65, 68, where the plaintiff, who was in need of hospital services, was fraudulently induced by the defendant to transfer his property to her, by the representation that otherwise he would be charged excessive medical fees, it was said by Rugg, C.J., "It is common knowledge that the great public hospitals are charitable foundations where ordinarily humanitarian service is rendered freely to those who cannot pay, and at much less than cost to those of slender or moderate means." The court in the instant case was held in a place adjoining Boston. I think that it is also a matter of common knowledge that there are numerous and excellent incorporated charitable institutions located in Boston, which are conducted by those of the same faith as the child, to which she could have been turned over for the purpose of adoption by proper persons of her own faith. It would seem that a judge in the performance of his duties would learn of the existence of such institutions and the work in which they were engaged. It is not unreasonable to assume that the judge shared in this common knowledge when he denied the petition. Such a consideration would not be material if there was identity of religious beliefs, but it was pertinent if, as here, the parties were of different faiths, and for aught we know it became an integral part of the reason assigned for the denial of the petition. It could hardly be said there was any abuse of discretion if the judge considered the matter

just mentioned. The record does not show that he did not.

In controversies arising out of the adoption of a child where the parties are of different religions a conflict frequently arises between the benefit that the child will receive in supplying his material needs and the benefit he will receive in retaining his religious faith, and the legislation now considered was enacted to prevent benefits from the first class unduly overshadowing those of the second class. The religious aspect has not been made decisive, but the plain implication of the statute, § 5B, is that it must be given such weight that as a general rule an adoption of a child by persons of a different religion should not be granted. I am not satisfied that such weight was accorded the statute in the instant case. Accordingly I do not think the statute was wrongly applied in denying the petition.