Rouben Goldman & another, petitioners
(and a companion case[1]).

Essex. April 5, 6, 1954. — September 27, 1954.

Present: Qua, C.J., Ronan, Wilkins, Spalding, & Counihan, JJ.

*Adoption. Probate Court*, Appeal, Adoption proceeding, Findings by judge. *Evidence*, Relevancy and materiality. *Parent and Child. Infant. Constitutional Law*, Religion, Adoption.

At the hearing of proceedings after the enactment of G. L. (Ter. Ed.) c. 210, § 5B, inserted by St. 1950, c. 737, § 3, for adoption of twin children of tender years by petitioners of a religious faith different from that of the twins, detailed testimony from one connected with a charity as to the availability and suitability of married couples of the same religious faith as that of the twins who were "ready and willing to adopt" them was pertinent to the question whether within § 5B it was "practicable" to "give custody only to persons of the same religious faith as that of the" twins, and supported a finding by the judge in effect that it was "practicable." [650–651]

On appeals, with a report of the evidence, largely oral, from decrees of a Probate Court dismissing petitions for adoption of twin children of tender years by petitioners of a religious faith different from that of the twins, this court could not pronounce plainly wrong a finding by the judge in effect that it was "practicable" within G. L. (Ter. Ed.) c. 210, § 5B, inserted by St. 1950, c. 737, § 3, to "give custody only to persons of the same religious faith as that of the" twins, and affirmed the decrees, even though it also appeared that the petitioners were suitable persons and that the mother of the twins had consented to adoption by the petitioners. [651–652]

---

[1] A separate petition was filed for each of the twins.

G. L. (Ter. Ed.) c. 210, § 5B, inserted by St. 1950, c. 737, § 3, is not unconstitutional as a law "respecting an establishment of religion, or prohibiting the free exercise thereof" contrary to the First Amendment to the Constitution of the United States, and is not contrary to art. 2 of the Declaration of Rights or art. 11 or art. 46, § 1, of the Amendments of the Constitution of Massachusetts. [652]

With respect to a child of tender years, the words "religious faith . . . of the child" in G. L. (Ter. Ed.) c. 210, § 5B, inserted by St. 1950, c. 737, § 3, mean the religious faith of the child's parents in the absence of a "dispute." [652–653]

PETITIONS, filed in the Probate Court for the county of Essex on May 29, 1952.

The cases were heard together by *Phelan*, J.

*John F. Lombard & Leo Pfeffer* of New York, for the petitioners.

*John M. Fogarty*, guardian ad litem, pro se.

*Shad Polier, Will Maslow* of New York, *& Gerald A. Berlin*, by leave of court, submitted a brief as amici curiae.

QUA, C.J.   The petitioners, husband and wife, seek to adopt twin children, boy and girl, born at a hospital September 30, 1951.   The cases were heard upon oral evidence and also upon reports filed by the department of public welfare, in accordance with G. L. (Ter. Ed.) c. 210, § 5A, as appearing in St. 1950, c. 737, § 2, and reports of a guardian ad litem, all of which reports were received without objection as evidence at the hearing.   The judge made findings of fact, concluding that it would not be for the best interests of the twins to decree adoptions in these cases, and dismissed the petitions.   The petitioners appeal.   The evidence is reported.

General Laws (Ter. Ed.) c. 210, § 5B, inserted by St. 1950, c. 737, § 3, is as follows: "In making orders for adoption, the judge when practicable must give custody only to persons of the same religious faith as that of the child.   In the event that there is a dispute as to the religion of said child, its religion shall be deemed to be that of its mother.   If the court, with due regard for the religion of the child, shall nevertheless grant the petition for adoption of a child proffered by a person or persons of a religious faith or persuasion

other than that of the child, the court shall state the facts which impelled it to make such a disposition and such statement shall be made part of the minutes of the proceedings."

The petitioners obtained the children when they were about two weeks old from the hospital where they were born and have had them ever since. All of the evidence bearing on the ability of the petitioners to care for the twins, including that contained in the reports mentioned above, tended to show that the petitioners have a good home and sufficient means, are fond of the twins, and are giving them adequate care. The judge found that the petitioners are well equipped financially and physically to bring up the twins, and that they have treated them as their own children and intend to care for them and educate them to the best of their ability. The judge further found that the mother and "the natural father" of the twins are Catholics. There was ample evidence to support this finding. The mother did not cease to be a Catholic, even if she failed to live up to the ideals of her religion. If that were the test of belonging to a religious faith it is feared that few could qualify for any faith. The petitioners are of the Jewish faith and intend to bring up the twins in that faith. The mother has consented in writing on both petitions to the adoptions prayed for. She has never seen or spoken to the petitioners, but she has stated that she knew they were Jewish and was satisfied that the twins should be raised in the Jewish faith. The petitioners were informed by their attorney before they took the twins of the law relative to religion in adoptions, but they decided to take a chance that the petitions would be allowed. The petitioners have dark complexions and dark hair. The twins are blond, with large blue eyes and flaxen hair.

The judge further found that "Some difficulty has been experienced in attempting to determine the manner in which the twins came to the home of the petitioners, and the testimony of the petitioners in this matter was conflicting and wholly unreliable." We cannot say there was no support

for this finding.  We have not seen the witnesses.  Goldman testified at one point that he did not like to get the "mutual friends," through whom he and his wife heard of the twins, "involved in any legal situation" by revealing their names. A similar reticence on the part of the mother of the twins appears from reports of the department.  The judge may well have doubted whether all the circumstances had been revealed and whether the requirements of law, particularly of G. L. (Ter. Ed.) c. 210, § 11A, as appearing in St. 1950, c. 737, § 6, had been fully observed.  See now G. L. (Ter. Ed.) c. 119, § 40A, inserted by St. 1952, c. 596.

The judge also found that "there are in and about the city of Lynn [which is near the residence of the petitioners] many Catholic couples of fine family life and excellent reputation who have filed applications with the Catholic Charities Bureau for the purpose of adopting Catholic children of the type of the twins, and are able to provide the twins with a material status equivalent to or better than that of the petitioners, and with whom the twins could be placed immediately."  This finding was in effect a finding that it was "practicable," within the meaning of that word in § 5B, to "give custody only to persons" of the Catholic faith.  The finding rests upon detailed evidence from persons connected with Catholic charities as to many applications to adopt Catholic children by Catholic couples who had been investigated and found in good financial condition with good homes, "who are ready and willing to adopt these two children."  It is true that objection was made to the oral part of the evidence which follows that just quoted, and that it would have been desirable if more definite proof could have been had that suitable Catholic persons had actually seen these particular children and stood ready to adopt both of them at one time.  Such more definite proof, however, would probably in the circumstances have been hard to obtain.  The objection to the evidence was general "to this entire line."  We think it was directed against the pertinency of evidence of the general character involved in the line of inquiry rather than to the technical competency

of each separate question and answer. See *Holbrook* v. *Jackson*, 7 Cush. 136, 154; *Bryer* v. *P. S. Thorsen Co. of Massachusetts*, 327 Mass. 684, 686–687; *Ovington* v. *Racine*, 330 Mass. 333, 337. Moreover, the state of mind or intent of a person, whenever material, may be shown by his declarations out of court. *Commonwealth* v. *Trefethen*, 157 Mass. 180, 185–195. *Viles* v. *Waltham*, 157 Mass. 542. *Inness* v. *Boston, Revere Beach, & Lynn Railroad*, 168 Mass. 433. *Aldrich* v. *Aldrich*, 215 Mass. 164, 170. *Partridge* v. *United Elastic Corp.* 288 Mass. 138, 141. Wigmore on Evidence (3d ed.) §§ 1725, 1726. The "line" of evidence was competent, and we cannot say that the evidence itself fell so far short as to fail to support the finding of the judge last above quoted. We cannot say that a finding that it was practicable to give custody to persons of the religious faith of the twins cannot stand because the mother might refuse her consent required by G. L. (Ter. Ed.) c. 210, § 2, as appearing in St. 1950, c. 737, § 1, to adoption by any persons other than the petitioners. There was no evidence that she would take that position, and the judge was not obliged to assume that she would.

Some argument is advanced that there was here no "dispute" as to the religion of the twins and from that it is apparently sought to draw a conclusion that the religion of the mother should be disregarded. It would seem that there is a "dispute," since the guardian ad litem, as the representative of the children, contends that their religion is Catholic, while the petitioners at one stage in their argument seem to contend that it is not. But even if there is no "dispute" we think that for purposes of § 5B these twins, too young to choose a religion for themselves, must be deemed to belong to the Catholic faith for reasons hereinafter stated.

It is argued that the result of the present cases is inconsistent with that in *Gally, petitioner*, 329 Mass. 143. We do not agree. That case, as we were there careful to point out, came to us entirely upon documentary evidence. We were in as favorable a position to find facts as was the judge of

probate. 329 Mass. at page 145. The cases now before us were heard by the judge largely upon oral evidence. He saw and heard the petitioners face to face. The elements that entered into the final decision against adoption were elements of fact. They embraced all relevant circumstances. The burden of proof was upon the petitioners. The rule is that we can overturn findings of fact upon oral evidence only if they are plainly wrong. We do not feel that we can disturb the judge's finding against the petitioners.

It is contended that § 5B is unconstitutional as a law "respecting an establishment of religion, or prohibiting the free exercise thereof," contrary to the First Amendment to the Constitution of the United States, and as in some manner contrary to art. 2 of our Declaration of Rights and to art. 11 and art. 46, § 1, of the Amendments to the Constitution of this Commonwealth. With this we cannot agree. All religions are treated alike. There is no "subordination" of one sect to another. No burden is placed upon anyone for maintenance of any religion. No exercise of religion is required, prevented, or hampered. It is argued that there is interference with the mother's right to determine the religion of her offspring, and that in these cases she has determined it shall be Jewish. Passing the point that so far as concerns religion she seems to have consented rather than commanded and seems to have been "interested only that the babies were in a good home," there is clearly no interference with any wish of hers as long as she retains her status as a parent. It is only on the assumption that she is to lose that status that § 5B becomes operative. The moment an adoption is completed all control by the mother comes to an end. See c. 210, § 6, as most recently amended by St. 1950, c. 737, § 4.

We do not attempt to discuss the philosophy underlying the concept that a child too young to understand any religion, even imperfectly, nevertheless may have a religion. We have no doubt that the statute was intended to apply to such children, and that in such instances the words "religious faith . . . of the child" mean the religious faith of

the parents, or in case of "dispute" the faith of the mother. There is nothing new in this idea. In the leading case of *Purinton* v. *Jamrock*, 195 Mass. 187, at page 200, it was said long before the enactment of the statute that the parents' religion was prima facie the infant's religion. It was also there decided that weight should be given to that religion in matters of adoption. The present statute merely ascribes somewhat more weight than was before ascribed to the religion of the natural parents in the matter of making a decree for adoption. *Gally, petitioner*, 329 Mass. 143, 147–149. If neither parent had any religion we suppose the statute would have no application. It has no effect after the adoption is completed. The principle that children should, in general, be adopted within the faith of their natural parents has received widespread approval, as is attested not only by such decisions as *Purinton* v. *Jamrock* but also by the fact that most of the States now have statutes more or less similar to § 5B. See 54 Colum. L. Rev. 376 (March, 1954). We are not prepared to hold either such decisions or the statute unconstitutional. See *Zorach* v. *Clauson*, 343 U. S. 306.

*Decrees affirmed.*