Desmond, J.
(dissenting). This adoption order was invalid on two separate grounds and should be reversed. First, it violated section 373 of the Social Welfare Law and section 113 of the Domestic Relations Law, each of which requires that in making any order of adoption the court must ‘ ‘ when practicable ” give custody “ only to persons of the same religious faith as that of the ” child. In the second place, this adoption order fails to meet the requirement of section 111 of the Domestic Relations Law as to consent. This child’s mother had not “abandoned ” the child within the meaning of that statute *436 and on the facts of the case she had a right, which was denied to her by the court, to withdraw her previously granted consent to this adoption.
Adoptions in this State are strictly controlled by statutes (Matter of Thorne, 155 N. Y. 140; Matter of MacRae, 189 N. Y. 142, 143; Betz v. Horr, 276 N. Y. 83, 86, 87). The statutes protecting an adopted child’s religion are so fundamental that the People of this State voted them into the State Constitution itself (art. VI, § 18). Much is said here about the hardship of taking this four-year-old boy from his adopted parents but hard cases make no exception to the constitutional mandate or to our own duty to enforce it. And let it be remembered that the boy was not four years old but four hours old when, although all concerned knew the facts as to his religion, the completely illegal adoption consent was signed in the hospital. He was less than two years old when the true facts as to religion were testified to in County Court, some months after the adopted parents had falsely testified that he ‘ ‘ was born in the Presbyterian faith”. That the mother at an earlier time and before court proceedings were taken had made a false statement as to her religious affiliation could not lessen the court’s duty to protect the child’s religious rights when the court learned the truth. The passing of time could not make right what was wrong from the beginning.
We will first state briefly the material facts which are all undisputed and then take up separately the two grounds of invalidity. On November 15, 1953, in a Buffalo hospital, this baby was born (out of wedlock as the County Judge found) to appellant, who was married but, so she testified, had been separated from her husband since 1950. While living with her husband in Canada, she had borne him several children. According to her testimony at this trial and as found by the court, she and her husband and the man she named as the father of this child are all Roman Catholics. Before the birth of this child the mother had some discussions in Buffalo with her physician and a hospital nurse about a possible surrender or adoption of the child. As a result, the nurse got in touch with her friends, the petitioners Mr. and Mrs. Smith, who wished to adopt a child. The Smiths consulted their attorney. About four hours after the baby’s birth the attorney representing the *437 Smiths procured from the mother in her hospital bed a formal consent to the adoption by the Smiths of the newly born male child. That paper recites that the mother is not married to the father of the infant and that the father has abandoned the child. The last sentence of the consent reads as follows: 1 ‘ That your deponent does not at the present time embrace any religious faith ”. However, the nurse testified at this trial that the mother had told the nurse that both the mother and the infant’s father were Catholics. The Smiths then took the child from the hospital into their home and it was not until almost a year later that the mother learned that these adoptive parents were of a Protestant religious belief. When the child was about a year old the mother began to make demands that the child be returned to her, giving as her two reasons that she wanted the child back and that she did not wish him to be adopted by persons of a different religion.
When this adoption proceeding was brought by the Smiths, the County Judge directed (see Domestic Relations Law, § 111, subd. 4) that notice be given to the mother. She appeared by an attorney and testified as to her marital and religious status and swore that she was able to and wished to take the child back and raise it in her home in Canada. However, the court granted the order allowing the adoption by the Smiths on a finding that the consent of the mother was her free, voluntary and understanding act and that she had abandoned the child. The County Judge made it a condition of granting the order that the adopting parents agree to have the child baptized as a Catholic and educated in Catholic primary and high schools. The Appellate Division affirmed without opinion and we granted leave to appeal to this court.
The Constitution of this State (art. VI, § 18) and four different statutes applicable to varying situations (Domestic Relations Law, § 111; Social Welfare Law, § 373; Children’s Court Act, § 26, and Domestic Relations Court Act of City of New York, § 88, subd. 3) all state the long-established public policy of the State of New York that “ when practicable ” adoption must be by “ persons of the same religious faith as that of the child ”. Significantly, identity of religion is, other than age of adopting parents (Domestic Relations Law, § 110), the only substantive test in our comprehensive adoption laws of the eligibil *438 ity of proposed adoptive parents. The statute immediately applicable here and violated here is subdivision 3 of section 373 of the Social 'Welfare Law which is in full as follows: “3. In appointing guardians of children, and in granting orders of adoption of children, the court shall, when practicable, appoint as such guardians, and give custody through adoption, only to a person or persons of the same religious faith as that of the child.” Any doubt as to its meaning should be settled by the next following subdivision (§ 373, subd. 4) which reads thus: “ 4. The provisions of subdivision one, two and three of this section shall be so interpreted as to assure that in the care, protection, adoption, guardianship, discipline and control of any child, its religious faith shall be preserved and protected.” The only possible uncertainty as to meaning comes from the use of the qualifying phrase “ when practicable ”. There is no decision in this court construing that language but the only appellate decision in New York which states a construction (Matter of Santos, 278 App. Div. 373, 375, appeal dismissed 304 N. Y. 483) says that “ the legislative mandate leaves no area for judicial discretion ”. (The Krenkel case in the Appellate Division, Second Department, Matter of Krenkel, 278 App. Div. 573, though decided without opinion may be considered a contrary holding.) In the Santos case the statute directly in question was section 88 of the New York City Domestic Relations Court Act (supra). In subdivision 5 of section 88 we find what amounts to a legislative definition of “ when practicable ” since that subdivision says that the phrase shall be of no force or effect if there is available ‘ ‘ a proper or suitable person of the same religious faith or persuasion as that of the child ”.
This mandate that children shall be adopted to persons of their own religion ‘ ‘ when practicable ’ ’ has been in our statutes at least since 1884 (L. 1884, ch. 438, § 7). It was enacted to deal with well-known evils (see Schneider and Deutch, History of Public Welfare in New York State, Yol. 1, pp. 334-335; Yol. 2, pp. 165-166) and was apparently in accord with the then existing practices of the courts (see Matter of De Marcellin, 24 Hun 207, 209 [1881]). In situations to which the statutes were not directly applicable, the cases have followed the rule that a dependent child’s religion must be respected (see Matter of Jacquet, 40 Misc. 575 [1903]; Matter of Crickard, 52 Misc. 63, 66 [1906]; Matter of McConnon, 60 Misc. 22 [1908]).
*439 Apart from more fundamental reasons for such a rule of law, the rule was and is consistent with good social work practice (Lockridge, Adopting a Child [1947], p. 27; Cady, How to Adopt a Child [1956], p. 24; Glickman, Child Placement [1957], p. 7). In social work theory the religious requirement is part of the “ matching ” process to decide which children and parents are best suited to each other (Moppets on the Market, 59 Yale L. J. 715). And in legal principle it is an application of the fundamental right of a parent to control the upbringing of a child (see People ex rel. Portnoy v. Strasser, 303 N. Y. 539; People ex rel. Kropp v. Shepsky, 305 N. Y. 465; Matter of Zorach v. Clauson, 303 N. Y. 161, affd. 343 U. S. 306). The New York view that religious considerations are decisive has been severely criticized (see 65 Harv. L. Rev. 694; 27 N. Y. U. L. Rev. 848, and 28 Ind. L. J. 401) but it expresses our settled public policy.
A number of States besides New York have statutory requirements as to religious considerations in adoptions and the statutes of at least five such States contain the identical phrase “when practicable ” (see 9 Code of Georgia Ann., tit. 24, § 24-2423, Ga. Acts, 1951, pp. 291, 305; Rev. Stat. of Missouri [1949], § 211.140 [formerly Missouri Rev. Stat., § 9691; Rev. Stat. of Nebraska [1943], ch. 43, § 216; Smith-Hurd Illinois Ann. Stat., ch. 4, § 4-2; Rhode Island, General Laws, 1956, Yol. 3, tit. 15, ch. 7, § 15-7-13; Ann. Laws of Massachusetts, Yol. 6-A, ch. 210, § 5B). The cited Massachusetts law adopted in 1950 has been held by the Massachusetts Supreme Court to leave some discretion in the adoption tribunal as to whether to insist on the same-religion requirement (Matter of Gally, 329 Mass. 143; Ellis v. McCoy, 332 Mass. 254). However, the Massachusetts statute, while it is an adaption of part of our statutory scheme, contains no requirement like that of subdivision 4 of section 373 of our Social Welfare Law (supra) which directs “when practicable ” to be so interpreted as to “ assure ” that the child’s religious faith shall be preserved and protected. While the other States with statutes somewhat like ours have given their statutes varying interpretations (see citations in Cooper v. Hinrichs, 10 Ill. 2d 269, 273), it quite plainly appears that our constitutional provision and our statutes were intended to mean that when it is possible to arrange an adoption to foster parents of the same religion as *440 that of the child, adoption to parents of a different religion is prohibited. An authoritative study (Grellhorn, Children and Families in the Courts of New York City [1954], pp. 263-265) says that without exception the Surrogates who were interviewed by the study group applied these “ same-religion ” statutes “ rigorously ”.
Indications of the strength of our State policy in this respect are found in subdivision 2 of section 112 of the Domestic Relations Law requiring the petition for adoption to state the religious faith of the petitioners and of the foster child and his parents; in section 117 of that law authorizing abrogation of an adoption for a failure to safeguard the religion of a child, and in subdivision 5 of section 373 of the Social Welfare Law which says that if the child is adopted to persons of a different faith the court must state the facts which “impelled such disposition ”. In the present case no effort was made to find adoptive parents of the same faith as that of the child and at the first hearing they stated the child’s religion to be Protestant. As to whether an adoption to Catholic parents was practicable, there is no proof (see Matter of Goldman, 331 Mass. 647, 650) but it is inconceivable that in the city of Buffalo such persons could not be found. We conclude that this adoption was in direct violation of the statutory and constitutional mandate and was beyond the power of the court to order.
Now we turn to the second ground of invalidity, that is, the absence of an effective consent by the natural mother. As we have seen, section 111 of the Domestic Relations Law requires, for the adoption of a child born out of wedlock, the consent of the mother but makes unnecessary such consent when the parent has ‘ ‘ abandoned ’ ’ the child. There was here the consent by the mother signed on the day of birth but it seems to be the settled rule in the lower courts that up to the time of the making of the adoption order such a consent is not irrevocable (Matter of Anonymous, 178 Misc. 142, and the many cases cited therein). Although some of the decisions (and other authorities, see Grellhorn, Children and Families in the Courts of New York City, supra, p. 258) say or suggest that the mother’s consent may as matter of right be withdrawn at any time before the order, we need not go that far in this case (see Matter of Anonymous, 286 App. Div. 161, 164-166). We read the County Judge’s opin *441 ion in the present ease as permitting a cancellation of the consent signed by appellant. But whether or not that is the meaning of the County Court opinion, we would hold that this consent is revocable. Obviously, it was one of those regrettable and unfortunate ‘1 hurried decisions to give up a child, made under strain and anxiety ’ ’ from the results of which we must if possible protect the natural parent (see Essentials of Adoption Law and Procedure, 1949, U. S. Children’s Bureau, Publication No. 331 [1949], p. 2). Public policy forbids the giving of finality to a promise taken in a hospital just after birth from a woman who was given no adequate advice or information, especially as to the religion of the proposed adoptive parents. Such a consent is as a matter of law not binding.
The County Court, apparently recognizing that such a consent was in itself no bar to the mother’s objections to this adoption, made a finding that she had abandoned her child, a finding which if well based would make consent unnecessary (Domestic Relations Law, § 111). But nothing in this record justified such a finding and the finding, we hold, was as matter of law erroneous. “ Abandonment ” implies fault and wrongdoing, not a mistaken or improvident effort to provide for the child’s future. In the sense of the adoption laws “ abandonment ” means, according to tradition and practice, absolute and unequivocal neglect and refusal to perform a parent’s natural and legal obligations of support, presence, love and care, a settled purpose to forego forever all parental rights (Matter of Larson, 31 Hun 539; Matter of Hayford, 109 Misc. 479; Matter of Cohen, 155 Misc. 202; Matter of Norris, 157 Misc. 333: Matter of Marks, 159 Misc. 348; Caruso v. Caruso, 175 Misc. 290; Matter of Paden, 181 Misc. 1025). The soundness of this approach was recognized by this court in Matter of Bistany (239 N. Y. 19). In the present case the mother did not leave her child on a doorstep neglected and unprovided for (see definition of “abandoned child” in Social Welfare Law, § 371). Mistakenly, she signed a consent to an adoption but that was not neglect but an attempt to provide for the infant. If that amounted to an abandonment, section 111 of the Domestic Relations Law which requires the mother’s consent unless the mother has abandoned would be meaningless or absurd. Not only in New York but elsewhere it is recognized that such a consent without *442 more cannot be considered an abandonment (Matter of Ashton, 374 Pa. 185), although under other circumstances the signing of a formal consent might be used as some part of the totality of proof establishing the ultimate fact of abandonment (Matter of Cohen, 155 Misc. 202, supra). Entirely aside from the religious question above discussed, this adoption could not validly be ordered unless at the time of making the order there was an existing abandonment or an existing consent and here there was neither. (Matter of Cohen, supra; Matter of Anonymous, 178 Misc. 142, supra; Matter of Anonymous, 195 Misc. 6; People ex rel. Anonymous v. Anonymous, 195 Misc. 1054, and Matter of Bistany, 239 N. Y. 19, supra).
There is another possible invalidity in this adoption but since it is not discussed by counsel we merely mention it. Section 111 of the Domestic Relations Law requires as to a child born in wedlock the consent of both parents. The mother here testified and the court accepted as fact that she had not lived with her husband for some three years before this birth. Probably that finding was correct but it was made without notice to the woman’s husband.
We realize that the effect of a reversal here would be to take this four-and-a-half-year-old child from the people who have cared for him since birth. It would be a sad experience for them. However, when the baby was only a year and some months old, the court was informed of the religion of the mother and her husband and the child’s putative father and the different religion of the petitioners and informed that the mother’s consent was withdrawn. Under the statutes the proceeding should have been dismissed forthwith.
These uncertainties and frustrations are always possible in so-called “ private ” adoptions. We point out that, on the contrary, when a parent ‘ ‘ has surrendered the child to an authorized agency for the purpose of adoption ” the parent’s consent is not required (Domestic Relations Law, § 111). Only through such surrenders, made voluntarily, freely and finally, can the purpose be achieved of protecting adopting parents ‘ ‘ from later disturbance of their relationship to the child by natural parents whose legal rights have not been given due consideration ” (see Essentials of Adoption Law and Procedure, U. S. Children’s Bureau, Publication No. 331 [1949], p. 2, supra).
*443 The order should be reversed, without costs, and the proceeding dismissed.
Judges Dye and Van Voorhis concur with Judge Fuld; Judge Froessel concurs in a separate memorandum; Judge Desmond dissents in an opinion in which Chief Judge Conway and Judge Burke concur.
Order affirmed.