## Stone Adoption

*Carl G. Herr*, for petitioners.

BOWMAN, P. J., February 11, 1960.—Harry Weisman and Anita M. Weisman, his wife, are desirous of adopting a female child, born December 9, 1957, and identified only as Baby Girl Stone. To effectuate that desire, they petitioned this court for the adoption of the child on November 13, 1958. Following hearings, at the first of which the natural mother of the child appeared and testified, we refused the adoption and dismissed the petition upon findings that the natural mother, at the hearing, withdrew her previously executed consents to the adoption and that abandonment had not been established with the required legal certainty for a period of at least six months.[1] An appeal to the Supreme Court followed. In an opinion filed by the Supreme Court on December 31, 1959, no. 285, January term, 1959,[2] we were reversed as to both findings and conclusions, and the record was remanded to us with the directives that we determine: "first, whether the fact that this child was born of a Protestant mother should preclude its adoption by persons of the Jewish faith under that portion of Section 1 of the Adoption Act . . . [of April 14, 1925, P. L. 127, as amended] which provides: 'Whenever possible, the petitioners shall be of the same religious faith as the natural parents of the child to be adopted'; [and] second, whether the best interests and the welfare of the child would be promoted by this adoption."

---

[1] Opinion reported at 57 Lanc. 33. (Ed.)

[2] Opinion reported at 398 Pa. 190, 197. (Ed.)

Prior to the amendatory Act of August 26, 1953, P. L. 1411, 1 PS §1, et seq., there was no statutory provision with respect to persons of one religion adopting a child of another faith. Nor were adoptions under such circumstances precluded: Harry Adoptions, 1 Fiduc. Rep. 649. The present provision, anent religion, has not, according to our research, been construed in any reported cases in Pennsylvania. Similar or identical provisions in the laws of other States have been construed. While decisions of other jurisdictions having similar statutes are not binding upon us or determinative, they are entitled to respect.

Section 4-2 of the Adoption Act of Illinois, Ill. Rev. Stat. 1953, c. 4, provides:

"The court in entering a decree of adoption shall, whenever possible, give custody through adoption to a petitioner or petitioners of the same religious belief as that of the child."

That provision is essentially the same as the Pennsylvania provision. Both contain words "whenever possible." In Cooper v. Hinrichs, 10 Ill. 2d 269, 140 N. E. 2d 293 (1957), the adopting petitioners were members of the Presbyterian church; the children whose adoption was sought were baptized in the Roman Catholic faith, although their father was a Lutheran. It was held by the Supreme Court of Illinois that the statute did not require denial of adoption notwithstanding the differences in religion between the adopting parents and the children; that under the statute, the court has discretion to determine primarily whether the child's best interest is served by the adoption; and identity of religion between the child and the adopting parents is significant but not an exclusive factor to be considered by the court in the exercise of this discretion.

The Illinois court cited, inter alia, Royer Adoption, 34 Del. Co. 402, and Butcher's Estate, 266 Pa. 479, in arriving at its interpretation and application of the

Illinois statute. Both cases were cited as having construed "a statutory provision similar" to the Illinois provision. Royer Adoption, however, was decided in 1946. In the opinion of that case, President Judge van Roden stated, at page 411:

"This court feels that it is generally desirable in adoption cases to have children adopted into homes of the same religious faith as their natural parents, but such fact alone will not be permitted to prevent adoptions by persons of another faith if such adoption will best promote the child's welfare."

Butcher's Estate involved the appointment of a guardian of the person of a minor.

Section 373(3) of the Social Welfare Law of the State of New York provides that "in granting orders of adoption . . . the court shall, *when practicable*, . . . give custody . . . only to . . . persons of the same religious faith as that of the child." In Maxwell's Adoption, 4 N. Y. 2d 429, 151 N. E. 2d 848 (1958), the Court of Appeals of New York interpreted the term "when practicable" to be "of broad intent, necessarily designed to accord the trial judge a discretion to approve as adoptive parents persons of a faith different from the child's in exceptional situations," and added:

"Had the legislature intended that in every case the child be adopted by persons of its own religious faith, it obviously would have made its design known by language far different from that which it used."

In that case the court permitted the adoption of a child whose natural mother professed to be of the Catholic faith (but who stated in an affidavit shortly after the birth of the child that she did not "at the present time embrace any religious faith") by petitioners who were Protestants.

Comparable statutes in other States pertaining to both adoptions and guardianships have been construed similarly. Controlling emphasis is given to the best in-

terests and welfare of the child. Diversity in religion is a factor to be considered but is not the exclusive factor. See In re Duren, 355 Mo. 1222, 200 S. W. 2d 343; In re McKenzie, 197 Minn. 234, 226 N. W. 746.

It appears that a somewhat different result was reached in Massachusetts where the religious provision is similar to that of New York. The statute reads:

"In making orders for adoption, the judge when practicable must give custody only to persons of the same religious faith as that of the child. . . . If the court, with due regard for the religion of the child, shall nevertheless grant the petition for adoption of a child . . . by a person or persons of religious faith or persuasion other than that of the child, the court shall state the facts which impelled it to make such a disposition. . . ."

In Petitions of Goldman, 331 Mass. 647, 121 N. E. 2d 843 (1954), petitioners, members of the Jewish faith, sought the adoption of twin children (born in 1951) whose mother and "natural father" were of the Catholic faith. The mother consented in writing to the adoption and stated that she knew the petitioners were Jewish and was satisfied that the twins should be raised in the Jewish faith. Petitioners obtained the children from the hospital when they were about two weeks old. The lower court found petitioners to be well equipped financially and physically to bring up the twins, had a good home, were giving them adequate care and treated them as their own children. The adoption, however, was refused, and the Supreme Judicial Court of Massachusetts affirmed, since it was found that there were residing near the residence of petitioners "many Catholic couples of fine family life and excellent reputation who have filed applications with the Catholic Charities Bureau for the purpose of adopting Catholic children . . . and are able to provide the twins with a material status equivalent to or better than that of the petitioners, and with whom the twins

could be placed immediately." In affirming, the court stated:

"This finding was in effect a finding that it was 'practicable' within the meaning" of the staute "to give custody only to persons" of the same religious faith as that of the child.[3]

Turning now to our own statute, we cannot regard the words "whenever possible" as insignificant. They cannot be construed or read out of the statute. The inclusion in the amendatory act of 1953 of a provision pertaining to the religious affiliations of persons indicates a legislative intent to stress the religious factor and to give preference in adoption to persons of the same religious faith as the parents of the child where they are otherwise qualified to promote the welfare of the child by adoption. But it is equally obvious that it was not intended that a difference in religion between adopting parents and children per se bar an adoption. If the legislature had intended that it be the declared policy of this Commonwealth that in all adoptions the religious faith of the adopting parents must be the same as that of the parents of the child to be adopted, it would have eliminated the words "whenever possible" in the entirety and more affirmatively revealed its intent. We thus conclude that, in each instance, the court has discretion to determine primarily whether the child's best interests are served by the adoption, and in the exercise of that discretion the identity of religion between the adopting parents and the natural parents is significant and desirable but not an exclusive factor.

---

[3] It was contended by appellants, the adopting petitioners, that the Massachusetts statue was unconstitutional as a law "respecting an establishment of religion, or prohibiting the free exercise thereof," contrary to the first amendment to the Constitution of the United States. This contention was rejected. A petition to the Supreme Court of the United States for a writ of certiorari was denied, 348 U. S. 942.

Butcher's Estate, supra, involved the appointment of a guardian of the person under section 59(b) of the Fiduciaries Act of June 7, 1917, P. L. 447, which provided, as does section 1013 of the Fiduciaries Act of April 18, 1949, P. L. 512, that "persons of the same religious persuasion as the parents of the minor shall in all cases be preferred by the court in their appointment of guardians of the person of such minors." It is stated, page 484:

"We do not construe this language to be a positive command to appoint such person, regardless of other considerations relating to fitness, or as taking from the court its discretion, nor in any way to relieve it of its duty to choose such person as in its opinion shall be best fitted to look after both the physical and spiritual welfare of the minor. The provision quoted requires that, as between two persons of equal standing and ability in other respects, the court is to appoint the one of the same religious faith as the parents, and only to this extent is the provision of the act intended to be mandatory. Otherwise, the words 'shall be appointed' would doubtless have been used instead of 'shall be preferred.' The welfare of the child must remain the primary consideration to which all other questions must yield."

It may be contended that it is difficult to comprehend a situation in which it would not be "possible" for a normal, healthy and attractive child to be adopted by persons of the same religious faith as the parents of the child to be adopted. But in a situation such as is now before us, this would involve tearing the child from the love and care of petitioners, the only persons she has ever known as father and mother, and placing her under institutional care or in a foster home until other parents could be found. As stated in Maxwell's Adoption, supra: "No law requires consequences so distressing."

We therefore conclude that the diversity of religion here present is not necessarily a bar under the quoted provision of the Adoption Act to the child's adoption by petitioners if the welfare of the child will be promoted thereby.

Harry Weisman is 35 years of age. Anita M. Weisman is 33 years of age. They were married in 1947. By adoption, in 1952, they are the parents of a son, Craig, now seven years old. As was previously found, both petitioners are of the Jewish faith and, for the nine years past, both have been members of Temple Beth El, Lancaster, which petitioners described as a "conservative" Temple. They own the dwelling in which they live at 730 East Madison Street, Lancaster. It is a two-story brick dwelling containing three bedrooms, one of which is occupied solely by the child they seek to adopt. The house was described by the investigating agency as attractively and adequately furnished.

Mr. Weisman is the owner and operator of a retail establishment in Lancaster known as the Direct Furnishing Company. Mrs. Weisman is the owner of a collection service known as the Upstate Collection Service, also located in Lancaster. She is not, however, actively engaged in its management. The combined income from these sources enables them to provide adequately for the care and well-being of the child. A medical report states that they are both in good health. Both petitioners bear an excellent reputation. They are personable and are, in our opinion, emotionally stable to become the parents of the child.

Baby Girl Stone is now two years old. She is an attractive, happy and normal child. Her appearance, as we observed it at a hearing held subsequent to the opinion of the Supreme Court, reflects the loving care and attention which petitioners have bestowed upon her. She has developed nicely and normally. We should not

now interrupt that development and wipe out a relationship of more than two years standing, especially so since the relationship began with the full knowledge and consent of the natural mother who, at the time of placement, had no objection to the child being "placed in a Jewish home," but whose main concern was that "the home is a good one." We unhesitatingly find that petitioners' home is all that the natural mother hoped it would be.

We are satisfied that all requirements of the Adoption Act have been complied with and that the best interests and the welfare of Baby Girl Stone would be promoted by her adoption by petitioners, Harry Weisman and Anita M. Weisman. We so find and determine.

And now, February 11, 1960, the prayer of the petition is granted, and a decree of adoption will be entered in accordance with our findings and conclusions herein.